Bruce **BAINES** et al., Appellants,

v.

**CITY OF DANVILLE, VIRGINIA,**
Appellee,

Hildreth G. **McGHEE** et al., Appellants,

v.

**CITY OF DANVILLE, VIRGINIA,**
Appellee.

Nos. 9080, 9082.

United States Court of Appeals
Fourth Circuit.

Reargued Jan. 11, 1965.

Decided Jan. 21, 1966.

Sobeloff and J. Spencer Bell, Circuit Judges, dissented.

William M. Kunstler, New York City (Arthur Kinoy, New York City, Ruth L. Harvey, Andrew C. Muse, Danville, Va., Morris E. Lasker, New York City, Samuel W. Tucker, Richmond, Va., J. L. Williams and Harry I. Wood, Danville, Va., on brief), for appellants.

John W. Carter, Danville, Va., for appellee.

Before HAYNSWORTH, Chief Judge, and SOBELOFF, BOREMAN, BRYAN and J. SPENCER BELL, Circuit Judges, sitting en banc.

HAYNSWORTH, Chief Judge:

In Baines v. City of Danville, 4 Cir., 337 F.2d 579, we held, among other things, that orders remanding to the state court 105 removed criminal cases were not reviewable on appeal or by mandamus.[1] In the interval between the preparation of the opinion and the entry of the final judgment, however, the Civil Rights Act of 1964 was enacted, providing in its Section 901 that 28 U.S.C.A. § 1447(d) be amended to authorize review, "by appeal or otherwise," of remand orders in civil rights cases removed under the provisions of 28 U.S.C.A. § 1443. Because of the intervention of the Civil Rights Act of 1964, we granted a petition for rehearing.[2]

I

We have no doubt that Section 901 of the Civil Rights Act of 1964 should be applied to appeals such as these which were still pending in this Court on the effective date of the act.[3] And we agree with the Second Circuit[4] that Section 901 should be construed as authorizing review through direct appeals rather than by mandamus only, despite the fact that remand orders may be interlocutory.

II

We turn then to the propriety of the remand orders.

The defendants were charged in the Corporation Court of the City of Danville, Virginia, with violations of an injunction and temporary restraining order, which had issued in response to alleged violence and excesses during racial demonstrations in Danville. The general background sufficiently appears in our earlier opinion.[5]

The injunctive order proscribed participation in mob violence and rioting and incitement to such conduct. It prohibited other conduct such as carrying deadly weapons, assembling, and obstructing traffic, but all of such prohibitions, by the repeated use of the words "unlawful" and "unlawfully" were limited to conduct in violation of other statutes or ordinances.

Removal of each of the 105 cases was effected by one of two removal petitions, a number of the petitioners joining in one, while the remainder joined in the other. Except that one of the petitions contains allegations designed to show that a trial in the Corporation Court of Danville is likely to be unduly restrictive and unfair, the two petitions are substantially alike. In conclusionary terms they allege that the petitioners were being prosecuted for demonstrating in the streets of Danville in protest against customs and practices perpetuating racial segregation, that the injunctive order is unconstitutional for "making criminal" conduct which is constitutionally protected and that the injunction is in violation of their civil rights. Each petition also contains an allegation, paraphrasing 28 U.S.C.A. § 1443, that the petitioners are

---

1. See Section II of the opinion beginning at page 596.

2. 337 F.2d at 602.

3. See Congress of Racial Equality v. Town of Clinton, 5 Cir., 346 F.2d 911; Rachel v. State of Georgia, 5 Cir., 342 F.2d 336.

4. People of State of New York v. Galamison, 2 Cir., 342 F.2d 255.

5. See particularly 337 F.2d 579, 583–585.

denied or cannot enforce in Virginia's courts rights under laws of the United States providing for equal rights and that they are being prosecuted for acts done under color of authority of such laws.

The relevant statute, as now codified in 28 U.S.C.A. § 1443, has been described as a "text of exquisite obscurity." [6] It reads:

> Any of the following civil actions or criminal prosecutions, commenced in a State court may be removed by the defendant to the district court of the United States for the district and division embracing the place wherein it is pending:
>
> (1) Against any person who is denied or cannot enforce in the courts of such State a right under any law providing for the equal civil rights of citizens of the United States, or of all persons within the jurisdiction thereof;
>
> (2) For any act under color of authority derived from any law providing for equal rights, or for refusing to do any act on the ground that it would be inconsistent with such law.

The statute is derived from the Civil Rights Act of 1866. The relevant language there is not so obscure, or its obscurity is not so exquisite as that of the present codification. That language is illumined by its immediate context in the Civil Rights Act of 1866, and by the context of that Act in its historical setting. Against that background, subsequent authoritative opinions of the Supreme Court are largely dispositive of the questions presented, and they are not properly subject to criticism as being ungenerous. Those Supreme Court decisions do not reflect the intention of the Thirty-ninth Congress, but the fact that they do not is the necessary consequence of a radical alteration of the congressional intention when the Congress prohibited post-trial removal of cases from state courts.

### III

Initially, we should closely examine the Civil Rights Act of 1866,[7] the antecedent of the present 28 U.S.C.A. § 1443.

Section 1 of that act declared that all native born people, except those subject to foreign powers and Indians, were citizens. It conferred upon the former slaves the

> same right * * * to make and enforce contracts, to sue, be parties, and give evidence, to inherit, purchase, lease, sell, hold, and convey real and personal property, and to full and equal benefit of all laws and proceedings for the security of person and property, as is enjoyed by white citizens, and shall be subject to like punishment, pains, and penalties, and to none other, any law, statute, ordinance, regulation, or custom, to the contrary notwithstanding.[8]

Section 2 made it a crime for anyone acting under color of any state law, regulation or custom to subject any person to the deprivation of rights conferred upon him by Section 1.[9]

Section 3 is the removal section [10] and is in the following language:

> *And be it further enacted,* That the district courts of the United States, within their respective districts, shall have, exclusively of the courts of the several States, cognizance of all crimes and offences committed against the provisions of this act, and also, concurrently with the circuit courts of the United States, of all causes, civil and criminal, affecting persons who are denied or cannot enforce in the courts or judicial tri-

---

6. Amsterdam, Criminal Prosecutions Affecting Federally Guaranteed Civil Rights: Federal Removal And Habeas Corpus Jurisdiction To Abort State Court Trial, 113 U.Pa.L.Rev. 793, 843.

7. Act of April 9, 1866, 14 Stat. 27.
8. Now 42 U.S.C.A. §§ 1981–1982.
9. Now 18 U.S.C.A. § 242.
10. Now 28 U.S.C.A. § 1443(1), (2).

bunals of the State or locality where they may be any of the rights secured to them by the first section of this act; and if any suit or prosecution, civil or criminal, has been or shall be commenced in any State court, against any such person, for any cause whatsoever, or against any officer, civil or military, or other person, for any arrest or imprisonment, trespasses, or wrongs done or committed by virtue or under color of authority derived from this act or the act establishing a Bureau for the relief of Freedmen and Refugees, and all acts amendatory thereof, or for refusing to do any act upon the ground that it would be inconsistent with this act, such defendant shall have the right to remove such cause for trial to the proper district or circuit court in the manner prescribed by the 'Act relating to habeas corpus and regulating judicial proceedings in certain cases,' approved March three, eighteen hundred and sixty-three, and all acts amendatory thereof. * * *

Then followed Sections 4 through 10, which are the enforcement provisions. They illuminate the antecedents of the clause which is now 28 U.S.C.A. § 1443 (2). Section 4 provided that every district attorney, marshal, deputy marshal and United States commissioner and all agents of the Freedmen's Bureau were charged with the enforcement of the act and authorized to arrest and institute proceedings against persons charged with its violation.[11] If the need should occur, the courts were authorized to increase the number of commissioners [12] for the purpose of arrest and examination of persons charged with violations of Section 2. In Section 5 the commissioners were authorized to appoint "one or more suitable persons" to serve warrants and other process and the persons so appointed were authorized to execute them. Moreover, any such suitable person appointed by a commissioner was authorized to call to his aid all bystanders or posse comitatus, and even the land and naval forces of the United States to assure compliance with this act.[13]

It thus appears that the statute contemplated that literally thousands of persons would be drawn into its enforcement and that some of them otherwise would have little or no appearance of official authority.

By Section 6 it was made a crime to wilfully hinder "any officer, or other person charged with the execution of any warrant or process * * * or any person or persons lawfully assisting him or them * * *." Section 7 gave to the person or persons authorized to execute process a fee of five dollars for each person arrested.[14]

The Civil Rights Act of 1866 was reenacted by Section 18 of the Civil Rights Act of 1870.[15] In that act, after making provision for voting rights and their enforcement, Section 16 redeclared the rights conferred by Section 1 of the Civil Rights Act of 1866. The right of equality was extended as to taxes, licenses and other exactions as well as to punishments, pains and penalties. Also, discrimination in state charges upon immigrants was prohibited. So far as is relevant here, however, the rights conferred by Section 16 of the Civil Rights Act of 1870 are identical to those conferred by Section 1 of the Civil Rights Act of 1866.

Section 17 of the Civil Rights Act of 1870 is comparable to Section 2, the penal provision of the Civil Rights Act of 1866, and Section 18 provided that enforcement of Sections 16 and 17 of the act shall be in accordance with the Civil

---

11. Now 42 U.S.C.A. § 1987.

12. Now 42 U.S.C.A. § 1989.

13. Now 42 U.S.C.A. § 1989.

14. Now 42 U.S.C.A. § 1991.

15. Act of May 31, 1870, 16 Stat. 140.

Rights Act of 1866, which was then re-enacted by reference.[16]

In compiling the Revised Statutes of 1875, when the sections conferring substantive rights were transferred to other places, it became necessary to rephrase the removal provisions of Section 3 of the Civil Rights Act of 1866. They appear in Section 641 of the Revised Statutes, which was in the following language:

> When any civil suit or criminal prosecution is commenced in any State court, for any cause whatsoever, against any person who is denied or cannot enforce in the judicial tribunals of the State, or in the part of the State where such suit or prosecution is pending, any right secured to him by any law providing for the equal civil rights of citizens of the United States, or of all persons within the jurisdiction of the United States, or against any officer, civil or military, or other person, for any arrest or imprisonment or other trespasses or wrongs, made or committed by virtue of or under color of authority derived from any law providing for equal rights as aforesaid, or for refusing to do any act on the ground that it would be inconsistent with such law, such suit or prosecution may, upon the petition of such defendant, filed in said State court at any time before the trial or final hearing of the cause, stating the facts and verified by oath, be re-moved, for trial, into the next circuit court to be held in the district where it is pending. * * *

The language remained in substantially that form until the code revision of 1948 when it was changed to read as it now does. The 1948 Reviser made substantial changes in the language,[17] all of which the Second Circuit has noticed with care in People of State of New York v. Galamison, 2 Cir., 342 F.2d 255. He disclaimed, however, any intention to alter its meaning and it seems appropriate to accept him at his word. In all of the material now appearing on the subject, there seems to be general agreement that the meaning of Section 1443 in its present form may be more reliably determined if attention is focused upon the language as it appeared in Section 3 of the Civil Rights Act of 1866 and Section 641 of the Revised Statutes of 1875.

Section 641 of the Revised Statutes of 1875 effected one significant change which requires our attention. It limited the right of removal to the pre-trial stage in the state court proceedings. Earlier, the Civil Rights Act of 1866 permitted post-judgment removal,[18] and it was post-judgment removal which the Thirty-ninth Congress envisioned as the primary means of effectuation of the purposes of Section 3.[19]

There is one final item in the formal legislative history which may be noticed. When the Congress provided in Section 901 of the Civil Rights Act of

---

**16.** It would be supposed that ratification of the Fourteenth Amendment in 1868 would have validated §§ 1 and 3 of the Civil Rights Act of 1866. There is no room for questioning their constitutionality after their reenactment in 1870.

**17.** To read as it now does, see Section II of this opinion.

**18.** Section 3 of the Civil Rights Act of 1866 adopted the removal procedure of the Habeas Corpus Suspension Act of 1863. Section 5 of the Act of 1863, 12 Stat. 755, 756–757, made the specified cases removable by a petition filed by a defendant in the state court "at the time of entering his appearance in such court,"

or "after final judgment" either party could remove the case to the Circuit Court by an "appeal" filed during the term in which the state court judgment was entered. Thereupon the Circuit Court was required, notwithstanding the state court judgment, to try the case de novo, as if originally brought there.

This right of post-judgment removal was specifically reconfirmed the next month after enactment of the Civil Rights Act. See the Act of May 11, 1866, 14 Stat. 46, amending the removal provisions of the Habeas Corpus Suspension Act of 1863, which supplied the procedure for removal under the Civil Rights Act of 1866.

**19.** See, infra Section IV.

1964 for appellate review of orders remanding removed civil rights cases, its attention was drawn to the judicial construction of the "cannot enforce" portion of the removal statute. In the Senate [20] and in the House,[21] there were expressions of opinion that the Rives-Powers cases in the Supreme Court were too narrow and that the Supreme Court should or would relax their rule. Those expressions reflect no appreciation of the fact that the reason § 1443(1) was not as useful and available as the Thirty-ninth Congress may have intended was congressional prohibition of post-conviction removal and not judicial penuriousness in the effectuation of congressional intention. If a majority of the Congress in 1964 thought the Supreme Court had misinterpreted the predecessors of 28 U.S. C.A. § 1443, it did nothing about it, though attention had been clearly focused on the subject. Minority expressions of an expectation of judicial reconsideration of congressional intent is not the equivalent of congressional redefinition of its intention. The absence of the latter is significant.

## IV

The contention that the cases are removable under 28 U.S.C.A. § 1443(1), the "cannot enforce" clause, is premised upon (1) allegations that they cannot expect a full and fair trial in the Corporation Court of Danville,[22] (2) that they were engaged in conduct protected by the first amendment in protest against denial to them of rights which, in part at least, were protected by the fourteenth amendment, and (3) that the injunction which they are charged with having violated is unconstitutional on its face or as applied. These contentions considered alternatively, as presented, or collectively cannot be sustained.

This requires us to determine (1) whether the statutory phrase "law providing for * * * equal civil rights" encompasses general first and fourteenth amendment rights, and (2) with what clarity removability must appear at the time the removal petition is filed.

It is readily apparent that the Civil Rights Act of 1866 was directed principally to the "Black Codes" and to those disabilities of slavery which had been firmly interwoven in the law of the Southern states. Those basic rights, the right to contract, to sue, to testify, to own property, to the protection of the law and its remedies, may have been inferentially conferred by the abolition of slavery, for their denial was its dependent, but they had not been widely or generally confirmed affirmatively. The Thirty-ninth Congress did that, but the Civil Rights Act's removal section was limited to those "who are denied or cannot enforce in the courts or judicial tribunals of the State or locality where there may be any of the rights secured to them by the first section of this act." It was then plain, beyond question, that removal would be available only upon a showing of denial of one of the rights enumerated in Section 1 of that act.

As we have seen in the preceding section, its reenactment in 1870 did not, in any relevant respect, enlarge the class of rights the denial of which would warrant removal. This was two years after ratification of the fourteenth amendment, but the Civil Rights Act of 1870 limited removal, in this aspect of the case, to instances in which one of the rights enumerated in the statute was denied or could not be enforced in the state courts. These were not the broad due process and equal protection rights of the fourteenth amendment, and assuredly

---

20. 110 Cong.Rec. 6344 (Senator Kuchel), 6551 (Senator Humphrey) and 6739–40 (Senator Dodd).

21. 110 Cong.Rec. 2770 (Representative Kastenmeir).

22. A paraphrase of the statute appears in both petitions. Factual allegations are included in only one, but they are made the principal thrust of the briefs. They are based upon alleged events before and during the trial of two of their arrested fellows. We will treat such allegations as having been made by all of the petitioners.

not the rights of the first amendment. The Statutes as they existed before the 1875 revision are susceptible to no other interpretation than that the rights, denial of which would warrant removal, are those rights specified in Section 1 of the Civil Rights Act of 1866 and Section 16 of the Civil Rights Act of 1870.

The difficulty arises out of the phrasing of Section 641 of the Revised Statutes of 1875. The revisers placed the substantive rights declared in Sections 1 and 16, respectively, of the Acts of 1866 and 1870, in Sections 1977 and 1978 of the Revised Statutes, separated from Section 641, the removal section. It thus became necessary to describe the rights in some other manner than by the words "rights secured to them by the first section of this act." The revisers could, of course, have referred to "the rights secured by sections 1977 and 1978." They chose instead the generic language, "any right secured to him by any law providing for the equal rights of the citizens of the United States, or of all persons within the jurisdiction of the United States * * *." This choice justifies the conclusion that the revisers intended Section 641 to be open-ended so that it would then include later acts couched in egalitarian terms, such as the Civil Rights Act of 1964. This is the view of the Second Circuit.[23]

The suggestion that the general reference to rights secured by any law providing for equal civil rights includes those guaranteed by the Constitution would attribute to the revised statutes a radical expansion of the removal provision. Against this we have the general intention of the Congress that the codification should not work substantive change, and the fact that the postwar Congresses clearly indicated an intention to keep the removal sections more limited.

When the Civil Rights Act of 1870 was enacted, the fourteenth amendment had been ratified two years earlier. But, as we have noted, the Congress in 1870 clearly restricted the right of removal to instances in which the relatively narrow rights that the statute specified were denied. They did not broaden them to include denial of the other rights sweepingly guaranteed by that amendment. The omission is made more pointed by the act of April 20, 1871.[24] Section 1 of that act created a civil remedy for deprivation under color of state law of any right, privilege or immunity secured by the Constitution.[25] In providing the civil remedy, there is a reference to the Civil Rights Act of 1866. In contrast to what had been done the year before in the Civil Rights Act of 1870, there was no reenactment of the removal provision to include within it those substantive rights granted in Section 1 of the Act of 1871. The choice appears deliberate.

The revisers of 1875 knew this, for in Section 1979 of the revised statutes, incorporating the provisions of Section 1 of the Act of 1871, now carried forward to 42 U.S.C.A. § 1983, the reference is to "the deprivation of any rights * * * secured by the Constitution and laws." Clearly, there, the word "law" was not intended to include the Constitution. It was used in the same sense in the related Section 641.[26] That is a natural construction of the word, and the only one consistent with the general congressional purpose in 1875 not to work substantive change. There are substantially contemporaneous uses of the word in the same sense, as in the opinion in Strauder v. West Virginia, 100 U.S. 303, 304, 25 L.Ed. 664. The 1875 revisers, as shown

---

23. People of State of New York v. Galamison, 2 Cir., 342 F.2d 255; see also City of Chester v. Anderson, 3 Cir., 347 F.2d 823.

24. 17 Stat. 13.

25. Now 42 U.S.C.A. § 1983.

26. Professor Amsterdam in his scholarly article written with such sympathy for demonstrators such as these petitioners expresses the same conclusion. Amsterdam, supra note 6, at 873. However, he would expand the removal provisions to include a denial of any right secured by what is now 42 U.S.C.A. § 1983.

by Section 1979, and Mr. Justice Strong in Strauder thought the "Constitution" above mere "laws" and employed the latter word in a sense exclusive of the former.

Nor can we find any reason to suppose that the revised statute was intended to expand the removal right in cases where the right denied was one secured by the Act of 1871 but not by the Acts of 1866 and 1870. The Congress had made a choice. The rights secured by the two earlier acts would support removal, if denied, while those secured by the Act of 1871 would not. There is no affirmative evidence anywhere that the Congress of 1875 intended to change this. The marginal references to the derivation of Section 641, otherwise complete, do not refer to the Act of 1871. The most reasonable explanation of the choice of language would appear to be that the revisers understood that the laws were not static and that the Congress in the future might enact additional legislation similar to the Civil Rights Acts of 1866 and 1870, with an intention to expand the removal rights. Their use of generic language in Section 641 would take care of that situation. It is reasonably susceptible to that construction without attributing to the revisers an intention to reverse the deliberate choice the Congress had so recently made.

We can discover nothing in Strauder v. West Virginia, 100 U.S. 303, 25 L.Ed. 664, in conflict with this construction. In answering the first question, whether exclusion of Negroes from the jury was a denial of Strauder's constitutional rights,[27] the Court necessarily considered the terms of the fourteenth amendment. When it reached the second question, however, removability, the Court expressly stated of the phrase "law providing for * * * equal civil rights," as used in Section 641, "This act plainly has reference to sects. 1977 and 1978. * * * * " [28] It concluded that there was a right of removal under Section 641, because, "by the constitutional amendment and sect. 1977 of the Revised Statutes, he was entitled to immunity from discrimination (in jury selection)".[29] That recognition of Sections 1977 and 1978 as the referents of Section 641 cannot be ignored.

We conclude therefore that to the extent that the petitioners claim defensively that their conduct was protected by the first amendment and that they were acting in aid of fourteenth amendment rights furnishes no basis for removal. Even if we could read the equal protection clause of the fourteenth amendment into the phrase "law providing for * * * equal civil rights" as used in § 641,[30] it would avail these defendants nothing in aid of their first amendment claim. The defense may be asserted in the state court and, if unsuccessful in the trial court, it may be considered by the Virginia Supreme Court of Appeals and, on certiorari, by the United States Supreme Court. And in the habeas corpus jurisdiction, the contention may ultimately be presented to the lower federal courts where the fairness of the state court's resolution of factual issues involved in the application of the constitutional requirements, as well as its conception of those requirements, will be open to review.

27. See the statement of the two questions, 100 U.S. at 305.

28. See 100 U.S. page 311.

29. See 100 U.S. page 312. In this extract there is a reference to the "constitutional amendment" as well as to Section 1977, but only because the statement came at the conclusion of the discussion of the constitutionality of Section 641, itself. The Court was stating, in a conclusionary way, that there was a right of removal under Section 641 because the state denied a right protected by Section 1977, which, with Section 641, was a valid implementation of the fourteenth amendment.

30. That is the stated position of the Second, Fifth and Ninth Circuits. See Peacock v. City of Greenwood, 5 Cir., 347 F. 2d 679, 682; People of State of New York v. Galamison, 2 Cir., 342 F.2d 255, 265, 271; Steele v. Superior Court, 9 Cir., 164 F.2d 781.

Neither does the contention that the injunction is unconstitutional facially or as applied warrant removal. The injunction is not obviously facially unconstitutional as applied to actual rioters. The constitutional question, if it arises, would come out of its application. Of course, it would be unconstitutional if it became the basis of a conviction of a peaceful man whose conduct was within the protection of the first amendment. This cannot be known until the cases are tried. Who among the petitioners, if any of them, were rioters cannot be known until there has been a factual hearing in every case. This is not the sort of inquiry which ought to be required as an incident of determining removability. If removability does not readily appear without a factual inquiry tantamount to a trial on the merits, removal should not be allowed.[31]

It has been consistently held in the Supreme Court that the right of removal must appear in advance of trial. The right of removal cannot be predicated upon the supposition that during the course of the trial or the sentencing, a protected right would be denied or the defendant would find himself unable to enforce it.[32]

These Supreme Court cases, most of them in the nineteenth century, reviewed state court refusals of removal, or were decided on a petition for mandamus. Until the present there have been no further cases in the Supreme Court because of the change in the practice to make removal effective without state court approval or acquiescence, coupled with the statutory prohibition of appeals from orders of remand. With the repeal of that provision prohibiting appeals, insofar as civil rights cases are concerned, it has become an active field of litigation and the Supreme Court soon may be expected to turn its attention to it. Most of the lower courts have consistently applied the rule pronounced in the Supreme Court cases and have held that the denial or inability must result from a state statute or a decision of the highest court of the state.[33]

31. See infra, the type of showing which the Reconstruction Congress thought necessary for removal, pp. 766–767. Removability here is predicated upon factual assertions of innocence which are controverted by the Commonwealth's charges of guilt of offenses cognizable in the courts of the states.

32. Com. of Kentucky v. Powers, 201 U.S. 1, 26 S.Ct. 387, 50 L.Ed. 633; Williams v. State of Mississipi, 170 U.S. 213, 18 S.Ct. 583, 42 L.Ed. 1012; Murray v. State of Louisiana, 163 U.S. 101, 16 S.Ct. 990, 41 L.Ed. 87; Smith v. State of Mississippi, 162 U.S. 592, 16 S.Ct. 900, 40 L. Ed. 1082; Gibson v. State of Mississippi, 162 U.S. 565, 16 S.Ct. 904, 40 L.Ed. 1075; Bush v. Com. of Kentucky, 107 U.S. 110, 1 S.Ct. 625, 27 L.Ed. 354; Neal v. State of Delaware, 103 U.S. 370, 26 L.Ed. 567; Com. of Virginia v. Rives, 100 U.S. 313, 25 L.Ed. 667; Strauder v. State of West Virginia, 100 U.S. 303, 25 L.Ed. 664.

33. See Steele v. Superior Court of California, 9 Cir., 164 F.2d 781; Hull v. Jackson County Circuit Court, 6 Cir., 138 F.2d 820; Maryland v. Kurek, D.Md., 233 F.Supp. 431; Anderson v. State of Tennessee, E.D.Tenn., 228 F.Supp. 207; Levitt & Sons, Inc. v. Prince George County Congress of Racial Equality, D. Md., 221 F.Supp. 541; State of Alabama ex rel. Flowers v. Robinson, N.D.Ala., 220 F.Supp. 293; State of Arkansas v. Howard, E.D.Ark., 218 F.Supp. 626; City of Birmingham v. Croskey, N.D.Ala., 217 F.Supp. 947; Van Newkirk v. District Attorney, E.D.N.Y., 213 F.Supp. 61; Petition of Hagewood, E.D.Mich., 200 F. Supp. 140; Rand v. Arkansas, W.D.Ark., 191 F.Supp. 20; Hill v. Com. of Pennsylvania, W.D.Pa., 183 F.Supp. 126; State of Louisiana v. Murphy, W.D.La., 173 F.Supp. 782; State of Texas v. Dorris, S.D.Tex., 165 F.Supp. 738; State of North Carolina v. Jackson, M.D.N.C., 135 F.Supp. 682; Bennett v. Roberts, W.D. N.Y., 31 F.Supp. 825; People of State of California v. Lamson, N.D.Cal., 12 F. Supp. 813; State of New Jersey v. Weinberger, D.N.J., 38 F.2d 298; White v. Keown, D.Mass., 261 F. 814; State of California v. Cheu Fan, N.D.Cal., 42 F. 865; State of Alabama v. Wolffe, M.D. Ala., 18 F. 836; People of State of New York v. Galamison, 2 Cir., 342 F.2d 255, 271 (dictum). But cf. Cox v. State of Louisiana, 5 Cir., 348 F.2d 750; Peacock v. City of Greenwood, 5 Cir., 347 F.2d 679; Rachel v. State of Georgia, 5 Cir., 342 F.2d 336.

It is not a substantial extension of this rule, but an application of it, to hold that, if the facts are undisputed or the state's allegations accepted as true, the case is removable if the Constitution would preclude any conviction. This is the conclusion of the Fifth Circuit in two recent cases.[34] Removability may appear with certainty from other circumstances. The principle thus far accepted is that removability must appear with some certainty when removal is undertaken and be not dependent upon the resolution of factual differences that also will determine the question of guilt or innocence or upon debatable assumptions that state courts will ignore the paramount authority of the Constitution.

It is objected that the rule of the Supreme Court cases leaves little room for effective removal under 1443(1). This is partially true,[35] but the rule's insistence that removal may be had only when denial of the right appears with clarity and certainty is consistent with the original intention of the statute. The restriction comes not from judicial lack of sympathy with the congressional purpose but from congressional revocation of the right of post-judgment removal.

As we have seen in Section III of this opinion, the Civil Rights Act of 1866 permitted post-judgment as well as pretrial removal, and post-judgment removal was very much in the mind of Congress when considering the Civil Rights Act of 1866.

In his veto message, President Johnson had read the removal section very expansively, but that interpretation was disowned when the Congress was considering passage of the bill over the veto. Senator Trumbull,[36] the bill's manager, made a speech in which he described the kind of showing of discrimination which was requisite for removal.[37] He said there would be no pretrial removal even in the face of a discriminatory state statute, for it should not be presumed in advance that the state court would apply a state statute which was in conflict with paramount federal law. If, in the state courts, the discriminatory statute was applied, then there would be a right of

34. Cox v. Louisiana, supra note 33; Rachel v. Georgia, supra note 33.

35. *Rachel* and *Cox,* cited in the preceding footnote are recent examples of the effectiveness of § 1443(1), but they are of no help to the removing defendants here, for the facts are far from settled.

36. Senator Trumbull was the chairman of the Senate Committee on the Judiciary and one of the principal architects of the congressional plan, hotly debated with Lincoln and Johnson, for reconstruction of the seceding states. Later, after the Reconstruction Acts' transfer of all judicial authority in the seceding states to military tribunals was threatened by the Supreme Court's decision in Ex Parte Milligan, 71 U.S. 2, 18 L.Ed. 281, it was he who undertook the representation of the United States in *McCardle's* case. McCardle, a newspaperman, had been convicted in a military tribunal of sedition because of articles he had published in his newspaper. Attorney General Stanberry declined to appear for the United States because of his announced opinions that the Reconstruction Acts were unconstitutional. Senator Trumbull was called upon to fill the breach. He met the issue head on by objecting that the application below had been made in the Circuit Court rather than in the District Court. He lost. Ex parte McCardle, 73 U.S. 318, 18 L.Ed. 816, and the Supreme Court proceeded to hear the case on the merits.

Trumbull then succeeded in having the Congress pass an act depriving the Supreme Court of appellate jurisdiction in habeas corpus cases appealed from the Circuit Courts. Though the impeachment proceedings were then underway, Johnson promptly vetoed the measure. He thought the Supreme Court should decide such constitutional questions. As promptly, Congress overrode his veto, and the Supreme Court acquiesced. It held the limitation upon its jurisdiction within the power of Congress. Ex parte McCardle, 74 U.S. 506, 19 L.Ed. 264. Its opinion on the merits was never announced.

Anyone interested in knowing what then happened to McCardle may consult Arthur John Keefe's columns in the May and November, 1964 issues of the American Bar Association Journal, 50 A.B.A.J. 500, 1093. (There are other references, but those give the essentials).

37. Cong. Globe, 39th Cong. 1st Sess. 1759 (April 4, 1866).

removal, post-judgment removal, for then the petitioner could show denial of his protected right. And if a freedman sought to enforce one of his protected rights in the state court, and it was denied him, then he could resort to the federal court. Removal would follow actual testing in each case.[38]

The rule applied in the Supreme Court is thus a liberalization of the original intention of the Congress, for it indulges the assumption that a discriminatory state statute will be applied in the state court.[39] The rule's insistence that the denial of the right be clearly shown, however, even though it goes to the extent of requiring an assumption that there will be no denial of the right in the absence of a discriminatory state statute, decision or something of that nature,[40] is thoroughly consistent with the original intention of the Civil Rights Act of 1866 and of its sponsors. Senator Trumbull was plainly of the opinion that the right to remove would not exist unless the impediment had some formal state sanction. Mr. Justice Bradley in 1874 expressed the same view in State of Texas v. Gaines, 23 Fed.Cas. p. 869, No. 13847, 2 Woods 342, in which it was held that local prejudice was not a ground for removal by a Negro charged with bigamy. When the Supreme Court was called upon in 1879 to interpret the statute, its reading was well anticipated and entirely consistent with the intention of the original act's chief proponent.

The relative inutility of the statute is the necessary result of elimination of the right of post-judgment removal, not of judicial emasculation.

The scheme of the Thirty-ninth Congress had consistency. If removability clearly appeared before trial, the case could be removed then. If it did not and the trial was discriminatory and the state court's judgment unfair, it could be removed after the judgment and retried in the United States Circuit Court. A short while later, however, it turned to other means to achieve its immediate objectives and a subsequent Congress repealed the most effective part of the removal provision of the Civil Rights Act of 1866.

The Civil Rights Act had been enacted over President Johnson's veto on April 9,

38. Aside from a grand look at the historical context and a penetrating exploration of the contest between the Congress and the White House which opened with Lincoln's Reconstruction Proclamation of December 8, 1863, which was widened by the answering enactment of the Davis Bill and further defined by Lincoln's proclamation of July 8, 1864 in explanation of his disapproval and which ended only with Grant's inauguration, Senator Trumbull's speech is the only really relevant legislative history evident at the time the Act was first passed or at the time the presidential veto was overridden. What Senator Trumbull said, insofar as here pertinent, was:

"* * * [H]e is not necessarily discriminated against, because there may be a custom in the community discriminating against him, nor because a legislature may have passed a statute discriminating against him; that statute is of no validity if it comes in conflict with a statute of the United States; and it is not to be presumed that any judge of a State court would hold that a statute of a State discriminating against a person on account of color was valid when there was a statute of the United States with which it was in direct conflict, and the case would not therefore rise in which a party was discriminated against until it was tested, and then if the discrimination was held valid he would have a right to remove it to a Federal court—or, if undertaking to enforce his right in a State court he was denied that right, then he could go into the Federal court; but it by no means follows that every person would have a right in the first instance to go to the Federal court because there was on the statute-book of the State a law discriminating against him, the presumption being that the judge of the court when he came to act upon the case, would, in obedience to the paramount law of the United States, hold the State statute to be invalid."

39. Unless the statute predates the constitutional provision which invalidates it. Neal v. State of Delaware, 103 U.S. 370, 26 L.Ed. 567. This may have been the situation which Senator Trumbull had in mind.

40. See the text, supra at footnote 34.

1866. The Thirty-ninth Congress then turned to an expansion and extension of the Freedmen's Bureau Bill. The Bill, finally enacted over President Johnson's veto on July 16, 1866, provided in its Section 14 [41] that in each of the Southern states, until fully restored in its relations with the national government and fully represented in the Congress, Negroes should have equal rights defined in terms closely paralleling those of Section 1 of the Civil Rights Act. Those rights were made enforceable by Bureau agents with military authority and protection and in military tribunals.

There followed a succession of Reconstruction Acts. The first of those, finally enacted over the presidential veto on March 2, 1867, [42] placed the Southern states under martial law. Civilian courts could function only if, and to the extent that, the military commander allowed them. In August 1867, General Sickles in his Order No. 10 suspended the operation of the federal courts in the Carolinas as well as that of the courts of those two states.

It thus appears that in the nine years during which the removal rights as enacted in 1866 remained intact, they were largely superseded by more direct enforcement means under military authority. There was little opportunity for their exercise. They might have become both useful and available after the final termination of the Reconstruction period in 1876, but, as we have seen, they were radically restricted in 1875 by the elimination of the right of post-judgment removal.

Under these circumstances, the judiciary cannot restore what the Congress struck from the statute or construe what remains to approximate the congressional intention before it struck the most important part of its earlier scheme. The Congress, of course, can act again. It can undo what it did in 1875; it can reduce the requirements for a showing of removability before trial, or it can leave matters as they are. The choice must be its, and the choice will inevitably involve many considerations of policy in the context of the present which are the exclusive province of the Congress.

Before acting definitively, and there certainly was no definitive congressional action in the minority suggestion in 1964 of judicial reconsideration of the Rives-Powers interpretation, [43] the Congress would certainly explore in depth a number of matters as to which, with its investigatory powers, it has far greater competence than the judiciary. These include an appraisal of the efficiency of the present scheme under which state courts are required to enforce federally guaranteed rights, with direct review of their interpretation and enforcement of such rights in the Supreme Court and with rights of collateral review in the habeas corpus jurisdiction of the federal courts where the adequacy and fairness of the state courts' fact-finding processes are also open to review. When, and under what circumstances, pretrial removal is necessary or appropriate for the protection of federally guaranteed rights should be considered in the light of alternative procedures, troublesome problems of federalism, the capacity of the federal courts to discharge added responsibilities, and the means by which responsible state action may be most effectively encouraged. These are policy considerations for which judges may have some competence, but in no case in our adversary system can the courts explore them on a reviewable record with the competence and the thoroughness of the Congress.

There are subordinate questions which are much more appropriately for the Congress. If the removal jurisdiction is to be expanded and federal courts are to try offenses against state laws, cases not originally cognizable in the federal courts, what law is to govern, who is to prosecute, under what law is a convicted defendant to be sentenced and to whose

---

41. 14 Stat. 173, 176–177.

42. 14 Stat. 428.

43. See the ultimate paragraph of Section III, supra, for a discussion of this.

institution is he to be committed—these are all questions to which there should be a congressional answer.

These are the very practical problems posed as long ago as Mr. Justice Field's dissenting opinion in Virginia v. Rives. There have been no answers, for congressional revocation of the right of post-judgment removal has substantially avoided the necessity for them. If the removal right is now to be greatly enlarged, such questions must be answered. Aside from the fundamental and incontrovertible proposition that enlargement of congressional purpose must be by the Congress, underlying problems of the desirability of enlargement and the incidental practical problems ought to have careful congressional consideration before any change is made.

 It is thus idle to speak of judicial implementation of the original, unmodified intention of the Thirty-ninth Congress. Who can say to what alternative that Congress would have resorted had it not made explicit provision for post-judgment removal? If it were known, however, it would be an irrelevance, for judges cannot ignore the major surgery wrought by subsequent Congresses. A court must take a statute in the form in which it was left by the last Congress that substantively reshaped it. Otherwise, it would arrogate to itself congressional authority.

 A further word needs to be said about the contention that the petitioners cannot obtain a fair trial in the Corporation Court for the City of Danville. They do not suggest, of course, any unfairness in Virginia's Supreme Court of Appeals, a Court which showed its courage and faithfulness to constitutional principles when, in Harrison v. Day, 200 Va. 439, 106 S.E.2d 636, it struck down Virginia's massive resistance laws which had been enacted in an effort to avoid desegregation of its schools. It would appear that the requirement of a showing of inability to enforce protected rights in the courts would require us to view all of its courts vertically, and that even

a successful showing of unfairness in the trial court would not be sufficient unless it were also shown that the appellate court was unfair, too, or that the unfairness of the trial court was not correctable on appeal or avoidable by a change of venue. In Com. of Virginia v. Rives, 100 U.S. 313, 322, 25 L.Ed. 667, for instance, the court appears to have looked at the state courts vertically, saying that if the anticipated wrong was done in the state trial court, it may be expected that "the error will be corrected in a superior court." Moreover, Com. of Kentucky v. Powers, 201 U.S. 1, 26 S.Ct. 387, 50 L.Ed. 633, supplies an emphatic answer. Powers, who had been the Republican candidate for the office of Secretary of State for Kentucky, had been charged with murder of the Democratic candidate for Governor. He had been thrice tried and thrice convicted, but each time his conviction had been reversed by the Kentucky Court of Appeals in four to three decisions. Powers charged that the machinery of the trial court was in the hands of Democrats, inflamed against him because of the killing, and that they had stacked the juries with Democrats, systematically excluding Republicans and Independents. On each appeal the Court of Appeals held that certain rulings of the trial court were unreviewable and those decisions became the law of the case binding upon the trial court at the fourth trial. Powers had also unsuccessfully sought to have introduced a pardon which had been given to him by the Republican Governor of the State, and that ruling had been affirmed and was binding as the law of the case upon the trial judge who was presiding at the fourth trial. If anyone was ever able to show unfairness in advance of the trial, Powers was. Nevertheless, the Supreme Court held that the District Court should have remanded the case to the state courts, for corrupt or illegal acts would furnish a ground for removal only if done in accordance with a statute as construed by the highest state court. In the absence of such a statute the only remedy was in the state courts, subject

ultimately to review on certiorari by the Supreme Court of the United States.[44]

Powers, of course, was able to make a much stronger showing than the petitioners here and the Powers decision requires the remand of their cases.[45]

While Powers may seem hard, it is the kind of claim which ought not to be made the basis of removal. It would require the federal judge to try the state court. When the question is what the state court will do in the future, as it must be, it is usually incapable of any certain answer. It is the kind of inquiry which would be most disruptive of federal-state relations and the greatest hindrance to state court processes. If there is any element of unfairness in the trial subsequently to be conducted in the Corporation Court of Danville, it ought to be corrected by Virginia's Supreme Court of Appeals, which readily recognizes its responsibilities.

Again, Professor Amsterdam appears to agree that this sort of claim ought not to be made the basis of removal.[46]

The Court of Appeals for the Fifth Circuit has recently allowed removals under Section 1443(1) in situations in which it appeared that under no circumstances could the state constitutionally convict the defendants.[47] When the state statute upon which the prosecution is founded is facially unconstitutional, or if the facts are so settled that it is clear that the state statute cannot be constitutionally applied to the defendants' conduct, most of the difficulties are avoided. Thus in Rachel v. State of Georgia the prosecutions were for trespass in connection with sit-ins occurring before the Supreme Court's decision in Hamm v. City of Rock Hill, 379 U.S. 306, 85 S.Ct. 384, 13 L.Ed.2d 300, and in Cox v. State of Louisiana the effort to prosecute the defendant for attempting to do what the Supreme Court had already held he could not constitutionally be convicted of doing was obviously a fruitless and unconstitutional harassment. In such cases the only real problem is whether or not the petitioner is able to show that his rights will be denied or cannot be enforced in the state courts. But those cases furnish no basis for our reaching a conclusion of removability here.[48]

---

44. Now, of course, Powers' claims, to the extent founded on the federal constitution, would be reviewable in the lower federal courts on habeas corpus.

45. Prior to 1875, when post-judgment removal was permissible, removal could be had after a trial if the judgment of the trial court was discriminatory or if there had been a denial of one of the protected rights. The judgment of the trial court was a sufficiently formal state sanction of the discrimination. Exhaustion of any right of direct appeal was not a prerequisite to removal. When that procedure is unavailable, however, when we are called upon in advance of trial to consider a claim of unfairness in the trial court, it is not unreasonable to look, as the Supreme Court did in Rives and Powers, at the whole state court system. If unfairness in the state trial court clearly appeared, it ought not warrant removal if readily avoidable by a motion for a change of venue or correctable on appeal. If a defendant is able to make with clarity and certainty a pretrial showing of unfairness in a state trial court, he should encounter no difficulty in establishing that unfairness after a trial.

46. Amsterdam, supra note 6, at 857–59, 862–63, 911–12.

47. Cox v. State of Louisiana, 5 Cir., 348 F.2d 750; Rachel v. State of Georgia, 5 Cir., 342 F.2d 336; cf. Peacock v. City of Greenwood, 5 Cir., 347 F.2d 679.

48. Rachel and Cox are clearly distinguishable because of the absence in those cases of any factual dispute and the clear showing that the Constitution foreclosed a successful prosecution in the state court. The opinions in those cases elide the other facet of the "cannot enforce" problem, however: the sufficiency of a pretrial showing that the state court will not enforce the clearly established right. See Neal v. State of Delaware, 100 U.S. 370, 26 L.Ed. 567. One month before Rachel, for instance, the Supreme Court of Georgia had held in Bolton v. State, 220 Ga. 632, 140 S.E.2d 866, that sentences imposed upon participants in "sit-ins" must be vacated. It recognized the paramount authority of Hamm v. City of Rock Hill.

In that situation, as in Cox, since the constitutional immunity from prosecution was clearly apparent, it may have been

## V

■ The contention that removal may be had under the provisions of 28 U.S.C.A. § 1443(2) need not now detain us long. In comparable situations it has been consistently rejected in every case in which it has been advanced.[49]

Relatively early in the history of this country, statutes were enacted giving federal officials the right to remove to the federal courts state proceedings instituted as a result of their official acts. In 1815 a statute [50] was enacted providing for removal of suits and prosecutions "against any collector, naval officer, surveyor, inspector, or any other officer, civil or military, or any other person aiding or assisting, agreeable to the provisions of this act, or under colour thereof, for any thing done * * * by virtue of this act, or under colour thereof." This was a customs act, and, eighteen years later, South Carolina's resistance to the tariff acts provoked another.[51] It authorized removal of any "suit or prosecution * * * against any officer of the United States, or other person, for or on account of any act done under the revenue laws of the United States, or under colour thereof, or for or on account of any right, authority, or title, set up or claimed by such officer, or other person under any such law of the United States * * *." There were other revenue acts with removal provisions, though they add nothing to the pattern established by the acts of 1815 and 1833. Federal officials charged with violations of state statutes in the exercise of their official duties under federal statutes were entitled to remove the case to the federal courts. So was one defending a title derived from such a customs or revenue officer under the act of 1833. The statutory language explicitly reached him.

It was against this background that the Civil Rights Act of 1866 was enacted. In its "color of authority" clause it authorized the removal of any proceeding against "any officer, civil or military, or other person, for any arrest or imprisonment, trespasses, or wrongs done or committed by virtue or under color of authority derived from this act or the act establishing a Bureau for the relief of Freedmen and Refugees, and all acts amendatory thereof, * * *." Its reference to the Freedmen's Bureau Act was appropriate, for, as we have noticed, the agents of the Freedmen's Bureau were charged with the duty of enforcement of the Civil Rights Act. There was, however, no language comparable to that of the Revenue Act of 1833, giving removal rights to occupants of "abandoned" or confiscated lands who resorted to self help to defend their possessions. Clearly, the "color of authority" provisions of the Civil Rights Act of 1866 were limited to officials engaged in its enforcement and to those other persons who assisted them. This is apparent not only from the omission of language of earlier statutes in aid of those claiming under official grants of estates but, more emphatically, in the concurrence of the language in the removal section and in the enforcement sections.

appropriate to consider the harassing effect of the pendency of the prosecution upon the defendants' exercise of protected rights, though here, again, one may suppose that the prosecution might have been terminated more readily by a motion to dismiss in the state court than by the uncharted route of removal. Consideration of the effect of the pendency of the prosecution can be of no assistance, however, on the other branch of the problem when the facts are unsettled and removability cannot be determined until they are resolved.

**49.** Though not always on precisely the same ground, see Peacock v. City of Greenwood, 5 Cir., 347 F.2d 679; Board of Educ. v. City-Wide Comm. For the Integration of Schools, 2 Cir., 342 F.2d 284; People of State of New York v. Galamison, 2 Cir., 342 F.2d 255; City of Clarksdale v. Gertge, N.D.Miss., 237 F. Supp. 213; State of Arkansas v. Howard, E.D.Ark., 218 F.Supp. 626.

**50.** Act of Feb. 4, 1815, ch. 31, § 8, 3 Stat. 195, 198.

**51.** Act of March 2, 1833, Ch. 57, § 3, 4 Stat. 633.

As we have observed earlier in Section III, the enforcement provisions of the Civil Rights Act of 1866 authorized the commissioners to appoint any number of "suitable persons" to assist those officers, and the "suitable persons" were authorized to serve warrants and make arrests. The "suitable persons" could call upon bystanders to assist them and even call out the military forces of the United States. In the enforcement sections those unofficial "suitable persons," and those other civilians whom they were authorized to command, are consistently referred to as "other persons." Those "other persons" authorized to make arrests in the name of the United States and to collect their fees of five dollars for each arrest are obviously the same "other persons" mentioned in Section 3. The suggested ambiguity in the reference in Section 3 to "other persons" vanishes with a look at the enforcement sections.

The enforcement provisions of the Civil Rights Act of 1866 have been carried into the 1948 Code. Commissioners are still authorized to appoint "suitable persons" to serve warrants and make arrests of persons charged with violating rights initially secured by the Civil Rights Act of 1866, and those suitable persons are still authorized to "call to their aid all bystanders or posse comitatus" and the land and naval forces of the United States or of the militia.[52] Every such person is still entitled to the five dollar fee for each person he arrests.[53]

The revisers of the 1948 Code enlarged 28 U.S.C.A. § 1442(a) (1) to include all officers engaged in law enforcement. That enlargement did not make Section 1443(2) tautological under the construction that we give to the latter section. It protects so many persons whose status

as officers under Section 1442(a) (1) would be highly dubious, to say the least, that it could not reasonably have been deleted. While the 1948 revisers' omissions and changes are subject to criticism,[54] it was stated that no change in meaning was intended, and we find none.

## VI

Finally, the petitioners claim that they may remove under the "refusal" clause of 28 U.S.C.A. § 1443(2). They say they refused to desist from their demonstrations on the ground that it was protected conduct.

Though the First Amendment can hardly be said to command one to express whatever views he has, this provision of the statute is available only to state officers. The refusal language was added by amendment in the House with the explanation that it was intended to enable state officers who refused to enforce discriminatory state laws in conflict with Section 1 of the Civil Rights Act of 1866 and who were prosecuted in the state courts because of their refusal to enforce state law, to remove their proceedings to the federal court.[55]

We conclude that these cases were properly remanded.

Affirmed.

SOBELOFF and J. SPENCER BELL, Circuit Judges (dissenting).

The extremely narrow construction which the majority gives to the removal statute comports neither with its historical context, nor its present language, nor with the spirit of those decisions of the Supreme Court which have given new breadth and meaning to the constitutional guaranty of equal rights to all our citizens, nor with the intent and purposes of the 1964 Civil Rights Act.[1]

---

52. 42 U.S.C.A. § 1989.

53. 42 U.S.C.A. § 1991.

54. See People of State of New York v. Galamison, 2 Cir., 342 F.2d 255.

55. Cong. Globe, 39th Cong., 1st Session, 1366–67 (March 13, 1866), 1413 (March 15, 1866).

1. See language of the House Judiciary Committee Report, U.S.Code, Cong. & Adm.News, 88 Cong., vol. 2, p. 2518, explaining the amendment to § 1447(d) al-

We would hold these cases removable under paragraph (1) of 28 U.S.C.A. § 1443 if the petitioners can satisfy the District Court of the truth of their allegations: that (a) they are unable to enforce their equal racial civil rights in the state court (discussed in Part I of this opinion), or (b) they have been denied these rights by state officials prior to trial (discussed in Part III).

## I. REMOVAL UNDER SECTION 1443(1): INABILITY OF CIVIL RIGHTS DEMONSTRATORS TO ENFORCE RIGHTS AT TRIAL

The petition recites that the injunction and the ordinances under which appellants were arrested, jailed and prosecuted are vague, indefinite and unconstitutional both facially and as applied. It also alleges that the arrests, even without the trials, were preventing the exercise of First and Fourteenth Amendment rights by the Negro community. Finally, it claims that the wholesale arrests and trials were part of a conspiracy of the white power structure of Danville to enforce a policy of racial segregation and discrimination. The majority in its original opinion[2] recognized that the petitioners alleged that they were seeking to exercise their First and Fourteenth Amendment rights in order to free themselves from official discrimination; that among other objectives they were seeking further desegregation of the public schools, theatres, and restaurants of Danville, the employment of Negroes by the city, and their representation on boards and commissions. The opinion conceded that "[i]f Danville discriminated against them in employment, of course, Fourteenth Amendment rights would be involved * * *."

The evidence taken in the District Court on the city's motion to remand—however conflicting on the question of which side used violence—leaves no doubt that the arrests grew out of demonstrations in which the Negro minority sought to protest what they believed to be a denial of their equal civil rights. It is further alleged, and must be taken as true for present purposes, that the arrests and threatened prosecutions were motivated by a desire to intimidate the entire Negro community of Danville; the newspaper editorials at the time voiced the hope that the Negroes would be "suppressed" and "put down." The sweeping injunction and complementary ordinance, put into effect after the first demonstrations, were allegedly applied to this end.

After their removal petitions had been filed in the federal district court, two of the present petitioners were tried in the Corporation Court of Danville, fined, and sentenced to 45 to 90 days for their participation in the demonstrations. The conduct of these two trials affords a striking illustration of the treatment to be expected by these petitioners in the state courts. Policemen were stationed at every corner of the room; lawyers were searched on entering and leaving the courtroom; and petitioners were required to appear in court from day to day for roll call, although the prosecutor could have had no expectation of trying more than a few of them on any one day. Thus any organized protests were effectively silenced and the defendants' ability to earn a living impaired. Then, all the cases were transferred to various courts throughout the state, some as far as 250 miles away.

The assumption that these Negroes' rights could be vindicated in the state courts was dramatically undermined by a ruling that flatly barred constitutional defenses to the charges against the demonstrators. The presiding judge announced from the bench, prior to the taking of any evidence, that he would not permit any such defense to be raised.

---

lowing appeal from remand orders in civil rights cases. The report points out that the absence of an appeal had been used "by many southern Federal judges to deny judicial relief for citizens who have

been prosecuted in the State courts for exercising their rights guaranteed by the Constitution."

2. Baines v. City of Danville, 337 F.2d 579 (4th Cir. 1964).

By stripping appellants of any opportunity to show in the record that their conduct was protected from state interference, this prohibition shows a clear inability to enforce their rights in the local tribunals.

These allegations clearly bring the petitioners within the first paragraph of 28 U.S.C.A. § 1443. We agree with the rationale of our brethren in the Fifth Circuit in Rachel v. State of Georgia, 345 F.2d 336 (5th Cir.), cert. granted, 382 U.S. 808, 86 S.Ct. 39, 15 L.Ed.2d 58 (Oct. 11, 1965), and Peacock v. City of Greenwood, 347 F.2d 679 (5th Cir. 1965). See Note, 51 Va.L.Rev. 950, 958–60, 971–72 (1965). In *Rachel* removal was held necessary in order to protect against discriminatory misuse of a facially constitutional statute to deny the petitioners their *equal rights* specifically derived from the 1964 Civil Rights Act.[3] In *Peacock* this principle was applied to permit removal where a facially valid statute was assertedly used to deny the petitioners rights to equal protection specified in the Fourteenth Amendment.[4]

As the Fifth Circuit correctly points out, the pre-trial application of state statutes to suppress demonstrators' equal civil rights distinguishes these cases from Rives v. Com. of Virginia, 100 U.S. 313, 25 L.Ed. 667 (1880) and Com. of Kentucky v. Powers, 201 U.S. 1, 26 S.Ct. 387, 50 L.Ed. 633 (1906), where the alleged inability to enforce rights could not be shown until the trial itself. (See Part IV for fuller discussion of this distinction.) Indeed, the experience of these petitioners, some of whom have already been told that federal constitu-

tional defenses could not be raised, presents even more compelling grounds for removal than in *Peacock*.

We turn now to an analysis of the principles underlying the removal statute, and the reasoning of the majority opinion.

## II. SCOPE OF PROTECTED RIGHTS

### (a) *The Civil Rights Act of 1866*

Our brethren argue that the rights to be protected by removal were "limited" to those specified in section 1 of the 1866 Civil Rights Act, as contrasted to those guaranteed by the later enactment of the Fourteenth Amendment, and assume without further analysis that the rights asserted by these petitioners were not encompassed within section 1.[5] However, the evidence is overwhelming that from the time Congress took the initial step in 1866, it envisaged a broad understanding of the protections section 1 afforded the Negro. In addition to the right to make and enforce contracts, sue, give evidence, etc., the statute gave to all persons

"the same right [to] * * * full and equal benefit of all laws and proceedings for the security of person and property, as is enjoyed by white citizens, * * * *"

and further provided that such persons

"shall be subject to like punishment, pains and penalties, and to none other, any law, statute, ordinance, regulation, or custom, to the contrary notwithstanding." Act of April 9, 1866, ch. 31, § 1, 14 Stat. 27.

Both supporters and opponents of the measure understood that the civil rights

---

3. Act of July 2, 1964, Pub.L. 88–352, 78 Stat. 246.

4. To the extent that these demonstrators were seeking enforcement of rights guaranteed by the Civil Rights Act of 1964, their prosecutions would clearly be abated. Hamm v. City of Rock Hill, 379 U.S. 306, 85 S.Ct. 384, 13 L.Ed.2d 300 (1965). The present opinion of the majority accepts the holding of *Rachel* that prosecutions for conduct protected by the Civil Rights Act are removable to the federal forum. Thus, at the very least,

there must be a hearing to determine whether any of these petitioners are entitled to removal under *Rachel*, since the District Judge made no findings of fact. See 337 F.2d at 583.

5. The majority frame the issue to be whether "law providing for * * * equal civil rights" encompasses *"general* first and fourteenth amendment rights." (Emphasis added.) But the inquiry is not so broad—the issue is only whether that phrase encompasses the denial of "egalitarian civil rights" asserted here.

granted in section 1 were to be given the broadest possible scope,[6] and it was only to dispel any doubts concerning the authority of Congress to grant such sweeping rights to the Negro[7] that the Fourteenth Amendment was proposed and submitted to the states by the same Congress that enacted section 1 of the Civil Rights Act.[8] The enactment of the

Equal Protection Clause, in language closely paralleling section 1 of the 1866 statute,[9] legitimated beyond question Congress' attempt to protect the type of rights granted in the statute, and there is no reason to think that the rights contemplated by section 1 are of less breadth than those contemplated by the Equal Protection Clause.[10] Contemporary leg-

6. See 43 Cong.Globe, 39th Cong.. 1st Sess. at 599–60 (remarks of Senator Trumbull); id. at 1151 (remarks of Representative Thayer). In response to a question by Senator McDougall of California, opposing the bill, Senator Trumbull, manager of the bill in the Senate, stated:

"These I understand to be civil rights, fundamental rights belonging to every man as a free man, and which under the Constitution as it now exists we have a right to protect every man in."

Mr. McDougall: "Allow me to remark that I think all these rights should be conceded. Do I understand that this bill does not go further than to give protection to the enjoyment of life and liberty and the pursuit of happiness and the protection of the courts, and to have justice administered to all? Do I understand that it is not designed to involve the question of political rights?"

Mr. Trumbull: "The bill has nothing to do with the political rights or *status* of parties. It is confined exclusively to their civil rights, such rights as should appertain to every free man." 43 Cong. Globe, 39th Cong., 1st Sess. at 476.

The contrast drawn between *civil* and *political* rights in this exchange highlights the encompassing scope intended for section 1 in the civil sphere.

7. See 43 Cong.Globe, 39th Cong., 1st Sess. at 474–81, 497–507, 522–30, 569–78, 594–606 (Senate debates); id. at 1115–25, 1151–62, 1262–72 (House debates). The opposition argued that the bill invaded areas previously reserved to the states, by giving, for example,

" * * * authority over the judicial tribunals in the administration of law in the states; [and] denying to the states of their power of regulation." Id. at 478 (remarks of Senator Saulsbury).

And of particular significance to these cases was the expressed concern that any time "after the indictment," cases might be removed to the federal courts. Ibid.

The proponents of the bill replied that the granting of section 1 rights was authorized by the enabling clause of the Thirteenth Amendment and by the general power to grant citizenship to foreigners. See also Bickel, The Original Understanding and the Segregation Decision, 69 Harv.L.Rev. 1 (1955) (reprinted in appendix to Bickel, "Politics and the Warren Court" (1965)).

8. See Hurd v. Hodge, 334 U.S. 24, 32–33, 68 S.Ct. 847, 92 L.Ed. 1187 (1948); Slaughterhouse cases, 83 U.S. (16 Wall.) 36, 93, 96–97, 21 L.Ed. 394 (1873) (dissenting opinion of Field, J.); Maslow and Robinson, Civil Rights Legislation and the Quest for Equality, 20 U.Chi.L.Rev. 363, 368–69 (1953). The Joint Resolution submitting the Fourteenth Amendment to the states passed the Senate on June 8, 1866, and the House on June 13, barely two months after the enactment of the 1866 Civil Rights Act. 43 Cong.Globe, 39th Cong., 1st Sess. 3042, 3148.

9. The statute gave to all persons "the same right * * * [to] full and equal benefit of all laws and proceedings for the security of persons and property, as is enjoyed by white citizens, * * *,"
while the Equal Protection Clause provides:

"[N]or shall any State * * * deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV, § 1.

10. In Hurd v. Hodge, supra, n. 6, the question was whether section 1 of the 1866 Civil Rights Act prohibited enforcement of a restrictive covenant. Chief Justice Vinson, for the Court, said without dissent:

"In considering whether judicial enforcement of restrictive covenants is the kind of governmental action which the first section of the Civil Rights Act of 1866 was intended to prohibit, *reference must be made to the scope and purposes of the Fourteenth Amendment;* for that statute and the

islators [11] and the Supreme Court [12] have consistently read the two provisions together, and the Courts of Appeals have all assumed that a deprivation of equal protection rights would support removal.[13]

Here the Negroes assert that the rights they were attempting to secure by means of the aborted demonstrations were their "equal civil rights"—rights to desegregated schools, libraries, etc. They further allege that the arrests, threatened arrests, and pending prosecutions were not only part of the systematic suppression of these rights by the local government and community, but were also, in themselves, a deprivation on racial grounds of equal protection of the law. If substantiated, these allegations would clearly establish that petitioners were denied the same right to "equal benefit of all laws and proceedings for the security of person * * * as is enjoyed by white citizens." [14] Such a showing would entitle them to remove under the plain words of the original statute.

(b) *Subsequent History*

The majority traces the subsequent history of the removal provision in support of its narrow view of the class of rights protected, but we have already shown that from the beginning Congress took a broad view of section 1. Thus, while it is true that the 1870 re-enactment of section 3 [15] did not specifically add "constitutional" rights to the class of protected rights, this re-enactment was merely by reference, and there is no indication that Congress meant in any way to limit the scope of the 1866 coverage. Similarly, use of the phrase "rights * * * secured by the Constitution and laws" in the 1871 Civil Rights Act,[16] without revision of the re-

Amendment were closely related both in inception and in the objectives which Congress sought to achieve.

"Both the Civil Rights Act of 1866 and the joint resolution which was later adopted as the Fourteenth Amendment were passed in the first session of the Thirty-Ninth Congress. Frequent references to the Civil Rights Act are to be found in the record of the legislative debates on the adoption of the Amendment. It is clear that in many significant respects *the statute and the Amendment were expressions of the same general congressional policy.* Indeed, as the legislative debates reveal, one of the primary purposes of many members of Congress in supporting the adoption of the Fourteenth Amendment was to incorporate the guaranties of the Civil Rights Act of 1866 in the organic law of the land. Others supported the adoption of the Amendment in order to eliminate doubt as to the constitutional validity of the Civil Rights Act as applied to the States." Id. 334 U.S. at 31–33, 68 S.Ct. at 851–852 (Emphasis added.)

11. See Cong.Globe, 42nd Cong., 1st Sess., at 568 (remarks of Senator Edmunds). Commenting on the purpose of the 1871 Civil Rights Act, see infra n. 14, Senator Edmunds said

"it is merely carrying out the principles of the [1866] civil rights bill, which

has since become a part of the Constitution."

12. See Hurd v. Hodge, supra n. 6; Buchanan v. Warley, 245 U.S. 60, 78–79, 38 S.Ct. 16, 62 L.Ed. 149; Com. of Virginia v. Rives, 100 U.S. 313, 319, 25 L.Ed. 667 (1880).

13. See Peacock v. City of Greenwood, 347 F.2d 679, 682 (5th Cir.1965); Steele v. Superior Court of California, 164 F.2d 781 (9th Cir.1947); People of State of New York v. Galamison, 342 F.2d 255, 271 (2d Cir.1965) (dictum):

"There is no possible doubt that § 1443(1) applies to the grantees of equal rights under the equal protection clause and egalitarian statutes * *." (Friendly, J.)

14. Act of April 9, 1866, ch. 31 § 1, 14 Stat. 27.

15. Act of May 31, 1870, ch. 114, § 16, 16 Stat. 144. This is the provision conferring jurisdiction on federal courts for the enforcement of rights protected by the Act. The entire 1866 statute was re-enacted, following ratification of the Fourteenth Amendment, to insure constitutionality.

16. Act of April 20, 1871, ch. 22, § 1, 17 Stat. 13:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory,

moval provisions to include such expanded coverage, does not affect the broad meaning to be given the "equal civil rights" in the 1866 Act. The 1866 statute covered only egalitarian civil rights, while the 1871 statute provided a civil remedy encompassing the entire range of constitutional guarantees, egalitarian and otherwise. But insofar as the later statute secured equal protection rights, the two statutes protect the same class of rights. See Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961).[17]

Finally, the majority suggests that use of the generic phrase "law[s] providing for equal civil rights" in the 1875 recodification meant *only* that future "statutory" rights could be included among those rights the violation of which would be grounds for removal.[18] But the phrase is not so limited. It is more reasonable to say that the failure in 1875 either to refer to the specific recodifications of section 1 [19] or to use the term "*statutes* providing for equal civil rights" evidences the revisor's understanding of the broad view taken by the 1866 Congress of the rights protected by removal. This does not impart a new meaning to the statute; it simply recognizes the full scope of the original provision.[20]

subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

This provision now appears as 42 U.S. C.A. § 1983 (1958).

17. Both statutes were enacted in response to the difficulties faced by the newly-emancipated Negro, particularly through the inequal enforcement of state laws, see infra n. 23 and accompanying text. And while the 1871 Act covered a much wider scope of rights,

"[t]he model for it will be found in the *second section* of the act of April 9, 1866, known as the 'civil rights act.' * * * This section of this [1871] bill, on the same state of facts not only provides a *civil remedy* for persons whose former condition may have been that of slaves, but also to all people where, under color of State law, they or any of them may be deprived of rights * * *." Cong. Globe, 42 Cong., 1st Sess.App. 68. (Report by Mr. Shellabarger, reporting out the bill which became the 1871 Act.) (Emphasis added.)

The second section of the 1866 Act provided a *criminal penalty* against any state official who, acting under color of authority of a state law, statute, ordinance, regulation or custom, deprived a person of any of the rights granted in section 1. See n. 25 infra, and it was this same set of facts that authorized *removal* under section 3. See infra nn. 25–32 and accompanying text.

With respect to denials of equal civil rights, the 1871 Act was thus the third leg of a triangle. A person deprived of rights secured by section 1 of the 1866 Act could: (a) have the offending official subjected to criminal prosecution under section 2 of the 1866 Act, cf., e.g., Screws v. United States, 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945) (denial of broad due process rights); (b) protect the affected rights against further intrusions under section 3 of the same Act by removal to a federal court, see Peacock v. City of Greenwood, 347 F.2d 679 (5th Cir.1965) (suppression of equal civil rights by mass arrests); and (c) secure a civil remedy under section 1 of the 1871 Act against the offending state official. See, e.g., Dombrowski v. Pfister, 381 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965) (injunction against continuing suppression of equal civil rights under color of state law).

18. Use of the term "laws" in a broad sense to include "constitutions" as well as "statutes" was not unusual in the Reconstruction Congress. Section 2 of the 1866 Civil Rights Act, which established the preconditions for a section 3 removal, referred to deprivations of rights by any person under color of "any law, statute, ordinance, regulation or custom." "Laws" in this sense clearly embraces state constitutions. When the 1875 revisor came to recodify the various provisions of the 1866 Act, it was therefore natural for him to employ "laws" in section 641 in a similarly inclusive sense.

19. Rev.Stat. §§ 1977, 1978 (1875).

20. In fact, if our brethren's initial assumption of the restricted nature of protected rights is accepted, their suggestion that the term "laws" would permit future

## III. REMOVAL UNDER SECTION 1443(1): DENIAL OF DEMONSTRATORS' EQUAL CIVIL RIGHTS BY STATE OFFICIALS PRIOR TO TRIAL

The majority suggests that in 1866 Congress was primarily concerned with *post*-judgment removal, and that its excision in 1875 is responsible for the present "inutility" of the statute. However, a careful reading of the entire 1866 Act makes plain that removal was contemplated both for an inability to enforce rights at trial, as alleged here and discussed in Part I, supra; and also where state officials have denied the equal civil rights of Negroes before their trials. Section 2 of the original statute imposed criminal penalties against "*any* person" who, acting under color of authority of any state law, ordinance or custom, deprived another person of any right secured by section 1. Section 3 further provided that anyone who had been denied such a right could, at any time after a prosecution was *commenced* in the state courts, remove the cause to the federal court for trial. Thus, Congress anticipated pre-trial removal whenever a petitioner could show that he had been denied his equal civil rights by the actions of any state official proceeding under color of law. This portion of our opinion examines more closely the affinity between the criminal provisions of section 2 and the removal provisions of section 3, particularly in clarification of the debates over the bill.

### (a) *The Present Statute*

Section 1443(1) provides that, after a criminal prosecution has been *commenced* in a state court, it may be removed if the defendant is

> "any person who is denied or cannot enforce in the courts of such state a right under any law providing for the equal civil rights of citizens of the United States. * * *"
> 28 U.S.C.A. § 1443(1) (1958).

As drafted, this provision is subject to two significantly different interpretations, depending upon whether the phrase "is denied" contemplates a denial of rights at *any* time, or only denials which occur "in the courts of such State." The clause may be paraphrased in either of the following ways:

Removal is permissible by:

> (i) any person who is denied [,] or cannot enforce [,] in the courts of such State a right under any law * * *.

or

> (ii) any person who is denied [,] or cannot enforce in the courts of such State [,] a right under any law * * *.

Interpretation (i) limits removal to something that occurs or may occur only at the trial itself, while interpretation (ii) contemplates removal at any time after commencement of a prosecution, either where the affected person "is denied" a right (before or during the trial), or where he "cannot enforce [the right] in the courts of such State." [21]

As a matter of original statutory interpretation, alternative (i) renders "is

---

statutory grants to come within the removal clause would attribute to the 1875 revisor an intention to expand section 3 beyond its original scope, an intention steadfastly denied in the majority opinion.

21. Much of the difficulty in the interpretation of the statute is attributable to a failure to recognize the presence of these alternative constructions. As originally proposed by Senator Trumbull, the bill protected

> "persons who are denied or cannot enforce in the courts or judicial tribunals of the State or locality where they may

be any of the rights secured to them by the act;" 43 Cong. Globe, 39th Cong., 1st Sess. at 211 (Jan. 4, 1866).

The identical language, without clarifying punctuation, appears in section 3 of the original statute, Act of April 9, 1866, ch. 31, § 3, 14 Stat. 27. In the 1875 revision, it was slightly reworded to protect

> "any person who is denied or cannot enforce in the judicial tribunals of the State [, or in the part of the State where such suit or prosecution is pending,] any right secured to him by any law providing for the equal civil rights

denied" and "cannot enforce" tautological, for the inability to enforce a right at trial is precisely what constitutes its denial. On the other hand, alternative (ii) gives substance to both phrases: removal is appropriate whenever a protected right has been denied before the trial, and where it cannot be enforced at the trial itself. Moreover, the overall structure of the original statute and its legislative history plainly contemplated removal in both situations embraced by interpretation (ii).

(b) *The Original Statute*

Congress anticipated heavy resistance to the exercise of the rights granted the freedmen, not only from statutes which on their face discriminate against the Negro,[22] but also from state officials acting under cover of facially valid state laws,[23] and the 1866 Civil Rights Act clearly reflected this latter concern. Following the broad grant of equal rights in section 1, section 2 imposed criminal penalties against "any person" who, acting under "color [24] of authority of any

of citizens of the United States \* \*." Rev.Stat. § 641 (1875). (Bracketed material added in 1875 statute).

Despite the absence of any clarifying punctuation, the Court stated without discussion in Com. of Virginia v. Rives, 100 U.S. 313, 321, 25 L.Ed. 667 (1880), that "that act gives the right of removal only to a person 'who is denied, or cannot enforce, *in the judicial tribunals of the State* his equal civil rights.'" No explanation is given of the source of this punctuation, and it can only be explained by the concentration in *Rives* on the problem of showing a denial of rights which in that case was alleged would occur *at the trial iself*. See infra n. 40. The additional punctuation supplied by the Court served only to illustrate the statutory meaning in the context there discussed, not in all cases which might arise under the removal provisions.

Nevertheless, this may explain the assumption made by Professor Amsterdam that removal relates only to events or conditions in the actual trial itself, rather than to "denials" of equal civil rights occurring before trial. Compare Amsterdam, Criminal Prosecutions Affecting Federally Guaranteed Civil Rights: Federal Removal and Habeas Corpus Jurisdiction to Abort State Court Trial, 113 U.Pa.L.Rev. 793, 851 (1965) (hereinafter cited as Amsterdam). See also Note, 51 Va.L.Rev. 950, 952, 971 (1965).

22. These were the so-called "Black Codes." See, e.g., 43 Cong. Globe, 39th Cong., 1st Sess. 474 (Jan. 29, 1866) (remarks of Senator Trumbull); id. at 1151 (March 2, 1866) (remarks of Representative Thayer). It is clear from examination of the debates that these Codes were not the *exclusive* targets of the federal legislation; they were cited primarily as evidence of the inability of Southern Negroes to enforce their rights. See, e.g., id. at 603, 605, 1118, 1160.

23. See particularly Senator Trumbull's speech urging passage of the Act over President Johnson's veto, 43 Cong. Globe, 39th Cong., 1st Sess. at 1759 (April 4, 1866). See also id. at 1123 (remarks of Representative Cook); 1151 (remarks of Representative Thayer). A prime example was Virginia's vagrancy law, which General Terry, Commandant of the Virginia Military District, reported was being administered in such a way that

"[i]ts ultimate effect \* \* \* will be to reduce the freedmen to a condition of servitude worse than that from which they have been emancipated—a condition which will be slavery in all but its name." 43 Cong. Globe 1759.

Therefore, Terry ordered that "no magistrate, civil officer, or other person, shall, in any way or manner, apply or attempt to apply the provision of said statute to any colored person in his department." *Ibid.*

And in his discussion of Congress' authority to subject state officials to criminal sanctions under section 2 of the 1866 Act, Senator Trumbull averted time and again to deprivations of civil rights by both "State judges *and other officials*" and by "judges or Governors *or ministerial officers*." *Id.* at 1758 (emphasis added), a clear indication that Congress was concerned with more than just facial statutory denials of equal civil rights, occurring at the trial itself.

24. As originally introduced, this portion of the bill referred to persons acting under "cover" of authority; "cover" was changed to "color" in the final version, with no apparent change in meaning.

law, statute, ordinance, regulation, or custom," deprived a person of the rights secured by section 1.[25] Section 2 thus applied in terms to *any* state official;[26] and the deprivation of rights constituting an element of the section 2 offense could arise both before and during the trial.[27]

A criminal sanction having been provided in section 2 against the state official who deprived the Negro of his rights, section 3 of the statute established the judicial machinery for its enforcement. At the same time it opened a federal forum in which the person affected could assert the rights denied him. *First,* the district courts were given exclusive jurisdiction over the trials of state officials charged under section 2.[28] *Second,* those denied their rights were permitted to file original suits for their enforcement in the federal courts.[29] *Third,* in the language which with minor changes is now section 1443(1), Congress provided for the situation where rights had been, or would be, denied, but

25. This is now 18 U.S.C.A. § 242 (1958). Original section 2 provided:

"[A]ny person who, under color of any law, statute, ordinance, regulation, or custom, shall subject, or cause to be subjected, any inhabitant of any State or Territory to the deprivation of any right secured or protected by this act, or to different punishment, pains, or penalties on account of such person having at any time been held in a condition of slavery or involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, or by reason of his color or race, than is prescribed for the punishment of white persons, shall be deemed guilty of a misdemeanor."

Originally concerned only with the equal civil rights secured by section 1 of the 1866 Act, section 2 was expanded in 1874 to impose the same criminal sanctions for deprivations of any "rights, privileges and immunities" secured by the Constitution. See Rev.Stat. § 5510 (1875). In 1909, Congress added the requirement that such deprivations be made "willfully," Act of March 4, 1909, 35 Stat. 1092, although Senator Trumbull had expressed the view in the original debates that there could be no convictions under the section without a showing of criminal intent. 43 Cong.Globe, 39th Cong., 1st Sess. at 1758. See generally Screws v. United States, 325 U.S. 91, 98–100, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945). In all other respects, including the reference to "persons" acting "under color of any law," 18 U.S.C. § 242 is identical to section 2 of the 1866 Act.

26. See *e. g.,* Williams v. United States, 341 U.S. 97 (1951) 71 S.Ct. 576, 95 L.Ed. 774 (special policeman coercing confession); Screws v. United States, 325 U.S. 91, 65 S.Ct. 1031 (1945) (sheriff beating arrested Negro). In both instances the Supreme Court applied 18 U.S.C. § 242,

the successor to section 2 of the Civil Rights Act, to penalize illegal activities of police officials unrelated to any occurrences in the judicial process itself.

27. Concern was not merely with denial of rights in the courtroom. Congressional preoccupation with the role of state officials in the denial of Negroes' equal civil rights was demonstrated in still another way. Congress was aware that state officials who were unwilling to join in denying Negroes their equal civil rights might subject themselves to the possibility of prosecution in the state courts. For the protection of such officials the bill was therefore amended in the House to permit any state official to remove to the federal court any prosecution brought against him in the state court "for refusing to do any act on the ground that it would be inconsistent with [the Civil Rights] act." 43 Cong.Globe, 39th Cong., 1st Sess. 1366 (March 13, 1866); see id. at 1367 (remarks of Representative Wilson, House Judiciary Chairman and floor manager of the bill). Thus, had any state or local policeman been prosecuted for failure to enforce the Danville ordinances against these demonstrators, on the grounds that such sweeping arrests and prosecutions were effectively denying equal civil rights, his case would have been removable to the federal courts.

28. "[T]he district courts * * * shall have, exclusively of the courts of the several States, cognizance of all crimes and offences committed against * * * this act * * *."

29. "[The district courts shall have cognizance] of all causes, civil and criminal, affecting persons who are denied or cannot enforce in the courts or judicial tribunals of the State or locality where they may be any of the rights secured to them by the first section of this act; * * *."

prosecutions had already been instituted in the state courts:

"[I]f any suit or prosecution, civil or criminal, has been or shall be commenced in any State court, against any such person * * * such defendant is to have the right to remove such cause for trial to the proper district or circuit court * * *." Act of April 9, 1866, ch. 31, § 3, 14 Stat. 27.

The phrase "any such person" refers back to the "persons affected" in the second part of section 3—those who could have brought an original action to enforce the rights denied them; and this "denial" in turn refers to *a denial by some state officer,* either a judge or some other state official, who had acted "under color of authority of a state law, statute, ordinance, regulation or custom."

The denial of rights, to support removal after commencement of proceedings, was not limited to denials at the trial itself. Congress had two purposes in mind. It not only penalized the state officials who deprived a man of his rights; it sought at the same time to protect such affected person by giving him a federal forum for the trial of the matter in which those rights were involved.[30] In order to remove under section 3 of the Act, it was necessary only to show the deprivation of some "equal civil rights," protected by section 1 of the Act, by any person acting under color of state law.[31]

This interrelation between sections 2 and 3 of the original statute bears emphasis. Congress [32] and the President [33] both understood that the conditions for section 3 jurisdiction, including removal, were the same as those which could subject "any person acting under color of [state] laws, statutes, ordinances or customs" to liability under section 2. If a Negro's rights were denied by the actions of such state officer, the aggrieved party was permitted to have vindication in the federal court; either by filing an original claim or, if a prosecution had already been commenced against him, by removing the case to the federal forum.

When Congress authorized removal of causes "affecting persons who are denied or cannot enforce in the courts or judicial tribunals of the state or locality where they may be any of the rights secured to them by the first section of this act," the use of the disjunctive "or" between "are denied" and "cannot enforce" focused on two separate stages at which rights might be affected: before trial, when the rights were denied; and at the trial, where those rights could not be enforced. Thus, the statute clearly covers the allegations in these petitions that officials acting under color of authority of state statutes, ordinances and injunctions have suppressed appellants' equal civil rights by mass arrests and threatened prosecutions. If this be shown at their hearing, the cases are removable.

---

30. See note 17, *supra,* for discussion of the civil remedy against an offending state official, added in 1871 as the third leg of this triangle.

31. Nevertheless, the statute did not contemplate wholesale removal of all cases alleging denials of *any* equal civil right. In contrast to the broad class of rights subsequently protected by the criminal provisions of the Act of 1874, now 18 U.S.C.A. § 242 (1958), and the 1871 civil remedy against the offending state official, now 42 U.S.C.A. § 1983 (1958), Congress specifically qualified the removal rights in section 1 of the 1866 statute by the phrase "as enjoyed by white persons." The suggestion that section 1443 (1) might permit greatly expanded re-

moval is thus unfounded: the statute applies only to deprivations, under color of law, of equal *racial* civil rights. Compare Amsterdam, 874.

32. See Senator Trumbull's analysis of the two sections at 43 Cong.Globe, 39th Cong., 1st Sess. 1758–59 (April 4, 1866). In the House the point was made most clearly by Representative Kerr, who opposed the bill:

"Viewing [section 2] and the first section of the bill together, we learn that the proposed statute will be both remedial and penal in its character. It purposes to protect certain rights and to punish for the failure to protect them." *Id.* at 1270.

33. *Id.* at 1680; see n. 35, *infra.*

## (c) *The Johnson-Trumbull Debate*

In his message accompanying the veto of the 1866 Civil Rights Act, President Johnson expressed concern that the jurisdictional provisions of section 3 would divest the state courts "not only of jurisdiction of the particular case where a party is discriminated against, but of all cases affecting him or which might affect him." [34] It was in reply to this contention that Senator Trumbull employed the language quoted in part by the majority in support of its restricted view of pre-trial removal.[35] He first pointed out

34. See 43 Cong.Globe, 39th Cong., 1st Sess. at 1759 (April 4, 1866). This was Senator Trumbull's characterization of President Johnson's attack on the statute.

In reading the veto message *id.* at 1680, it is important to realize that the President's view of section 3's coverage depended on his concept of the type of state officers who might be subject to criminal liability under section 2. Johnson feared that the bill would divest the state judiciary of discretion to interpret and apply state laws; thus his statement that the measure could subject to liability "judges of the State courts who should render judgments in antagonism with (the bill's) terms; and * * * marshals and sheriffs, who should, as ministerial officers, execute processes, sanctioned by state laws and issued by State judges, in execution of their judgments." *Ibid.* Trumbull replied that while state judges were indeed among those who might be affected by section 2, *no* state official would be subject to its penalties unless he had acted with criminal intent, see *id.* at 1758; and the Senator did not address himself to the types of state officials involved. However, the courts have consistently given this provision its natural meaning, as applying to any state official before, during or after the trial. *Supra*, n. 27.

To support the construction of section 2 as applicable only to state officials acting in a judicial or post-judicial setting, the President read section 3 in a similar vein:

"The construction which I have given to the second section [which has since been rejected by the courts] is strengthened by this third section, for it makes clear what kind of denial or deprivation of the rights secured by the first section was in contemplation. It is a denial or deprivation of such rights in the courts or judicial tribunals of the State. It stands, therefore, clear of doubt that the offence and the penalties provided in the second section are intended for the State judge, * * *." 43 Cong.Globe, 39th Cong., 1st Sess. at 1680. (Bracketed words supplied.)

Since the President was concerned with the effect of the bill on state courts, it was natural to emphasize its application to the judiciary; but this was not its only application. The subsequent broad reading of the re-enactments of section 2 of the 1866 Act demonstrates that the two provisions, §§ 2 and 3, were intended to apply to all instances of deprivations of equal civil rights by *any* person acting under color of state law.

35. See note 38 and accompanying text of the majority opinion. The complete speech, insofar as it discussed section 3, was as follows:

"The President objects to the third section of the bill that it gives the district courts exclusive jurisdiction of all crimes and offenses committed against the act. Well, sir, that is no new thing. The United States courts have always had jurisdiction of crimes and offenses committed against United States laws. But it further, he insists, gives jurisdiction to all cases affecting persons discriminated against, as provided in the first and second sections of the bill; and by a strained construction the President seeks to divest State courts, not only of jurisdiction of the particular case where a party is discriminated against, but of all cases affecting him or which might affect him. This is not the meaning of the section. I have already shown, in commenting on the second section of the bill, that no person is liable to its penalties except the one who does an act which is made penal; that is, deprives another of some right that he is entitled to, or subjects him to some punishment that he ought not to bear.

"So, in reference to this third section, the jurisdiction is given to the Federal courts of a case affecting the person that is discriminated against. Now, he is not necessarily discriminated against, because there may be a custom in the community discriminating against him, nor because a legislature may have passed a statute discriminating against him; that statute is of no validity if it comes in conflict with a statute of the United States; and it is not to be presumed that any judge of a State court

that a state official could not be liable under section 2 (present 18 U.S.C. § 242) unless he had actually committed some act in deprivation of a person's equal civil rights. Conversely, the federal jurisdiction could attach only after the statute or the custom was actually applied to the complaining party, through the action of some state official. Since President Johnson had expressed concern about the bill's effect on the state judiciary, Senator Trumbull illustrated his point with the example of the unconstitutional state statute which, until applied *by a judge* to deny enforcement of rights, could not be said to have "affected" the defendant. Similarly, the mere existence of a local custom of discrimination would not support federal jurisdiction until it was applied against the party.[36]

Of course, since the main point under discussion was the possible criminal liability of a state judge arising from the application of state law, the Senator's statement that there would be no ground for removal until the statute was tested referred only to the in-court application of such a statute by the judge.[37] The Senator's comment, quoted by our brethren, is not inconsistent with the pattern of the statute as a whole, for until the judge applied a state statute *he* could not bring into operation either section 2 or section 3. The Senator did not say, as the majority would infer, that these sections could not be brought into play by the action of *other* officials, such as sheriffs and policemen, who might deny equal civil rights *prior* to the court proceedings.[38]

## IV. THE *RIVES–POWERS* DOCTRINE

We may agree with the majority that the Supreme Court's indulgence of the presumption that a facially unconstitutional state statute will be applied at the trial was a liberal construction of the 1866 Act, but it does not follow that this

would hold that a statute of a State discriminating against a person on account of color was valid when there was a statute of the United States with which it was in direct conflict, and the case would not therefore rise in which a party was discriminated against until it was tested, and then if the discrimination was held valid he would have a right to remove it to a Federal court —or, if undertaking to enforce his right in a State court he was denied that right, then he could go into the Federal court; but it by no means follows that every person would have a right in the first instance to go to the Federal court because there was on the statute book of the State a law discriminating against him, the presumption being that the judge of the court, when he came to act upon the case, would, in obedience to the paramount law of the United States, hold the State statute to be invalid." 43 Cong.Globe, 39th Cong., 1st Sess. at 1759, (April 4, 1866).

36. Section 3 also provided original federal jurisdiction for the assertion of rights denied by the actions of state officials, note 29, *supra*, but unless this were limited to persons who had actually been affected by a denial, it would have been possible for anyone to file such original action on a bare allegation of the existence of a discriminatory custom. This was clearly part of Johnson's concern; a concern answered by Trumbull's requirement that the person show a causal relation between the discriminatory statute or custom and the right sought to be enforced.

And as the majority suggests in its footnote 39, Senator Trumbull may only have been referring to a case where the state statutes predated the 1866 Act, which would be presumed to be a nullity under the supremacy clause. See Neal v. State of Delaware, 103 U.S. 370, 26 L.Ed. 567 (1881). Under this view, pretrial removal would be possible by a showing of state action under any state law which, after 1866, was either enacted or applied in deprivation of section 1 rights.

37. Compare State of Texas v. Gaines, 23 Fed.Cas. p. 869, No. 13847, 2 Woods 342 (1874), where Justice Bradley denied a removal petition containing only general averments of local prejudice; with no specification of how the petitioner had been affected at the time of removal.

38. The statute contemplated removal *"for trial"* at any time "after the *commencement* of proceedings." These phrases are rendered meaningless by an interpretation that prohibits removal at any time prior to trial.

is the *only* situation in which removal was contemplated. In all the cases denying removal in the late 19th Century, the complaint alleged some defect in the trial proceeding itself, arising from the anticipated application of a statute.[39] Until the petitioner was actually tried, therefore, he could not be said to have been "affected" by the illegal actions of "any person acting under color of any law, statute, ordinance, regulation or custom." [40]

These cases clearly have no application where removal is sought on assertions of a denial of equal civil rights relating not to some future stage of the proceedings, but to the very arrests and prosecutions which give rise to those proceedings. In our concern with the fate of the 105 defendants in the pending prosecutions, we note the intimidating effect of wholesale arrests and threatened arrests and prosecutions on the good faith efforts of all the demonstrators to secure equal civil rights for the Negro community of Danville. This feature sets the case apart from *Rives* and *Powers,* heavily relied on by the majority. To borrow a phrase from the later case of Douglas v. City of Jeanette, 319 U.S. 157, 164, 63 S.Ct. 877, 87 L.Ed. 1324 (1943), Powers was "[not] threatened with any injury other than that incidental to every criminal proceeding brought lawfully and in good faith." *Powers* presented no problem of the protection of civil rights against erosion by the very pendency of the prosecution. The answer given Powers, namely, that ultimately his rights might be fully vindicated in the Supreme Court of the United States, is no answer to these petitioners and the Negro community of Danville. The suppression of their freedom of speech and their right

**39.** See, *e. g.,* Com. of Kentucky v. Powers, 201 U.S. 1, 26 S.Ct. 387, 50 L.Ed. 633 (1906); Bush v. Com. of Kentucky, 107 U.S. 110, 1 S.Ct. 625, 27 L.Ed. 354 (1882); Neal v. State of Delaware, 103 U.S. 370, 26 L.Ed. 567 (1881); Com. of Virginia v. Rives, 100 U.S. 313, 25 L.Ed. 667 (1880).

**40.** This was clearly the concern of the Court in the pivotal case of Com. of Virginia v. Rives, 100 U.S. 313, 25 L.Ed. 667 (1880). In their removal petitions filed before trial, petitioners had alleged that their right to equal protection of the laws would be denied in their state trials because of systematic exclusion of Negroes from the jury. The Court pointed out that the 1875 version of the removal statute anticipated only pretrial removal, *id.* 100 U.S. at 319,

"[b]ut the violation of the constitutional provisions, *when made by the judicial tribunals of a State,* may be, and generally will be, after the trial has commenced." *Ibid.* (Emphasis added.)

Thus, a defendant would not be able to affirm until at or after the trial itself that the equal protection of the laws would not be extended to him, and

"[i]t is obvious, therefore, that to such a case—that is, a *judicial* infraction of the constitutional inhibitions, after trial or final hearing has commenced—sec. 641 has no applicability. It was not intended to reach such cases." *Ibid.* (Emphasis added.)

Consequently, with respect to denials of rights which would not be manifested until the trial, the only way in which removal could be invoked would be by showing that the state had already acted to deny these rights through specific legislation affecting the pending trial. Such legislation alone, in the *Rives* view, would support an affirmation of "inability to enforce" rights in the state court. *Id.* 100 U.S. at 321.

The particular factual setting of *Rives* —claims of *prospective* denial of equal rights in the state court—explains the Court's later dictum that the act

"gives the right of removal only to a person 'who is denied [,] or cannot enforce [,] in the *judicial tribunals of the State* his equal civil rights.'" *Ibid.* (Brackets added; emphasis in original.)

Since the defendants had relied on claimed denials that would arise, if at all, in the courts of the state, the punctuation added to the Court's quoted excerpt from the 1875 Act indicates no more than an emphasis on the particular allegations involved in the case. The Court did not purport to deal with the case where the denial of rights itself—not the evidence of a prospective denial—occurred prior to trial; its earlier emphasis on the elimination of post-judgment removal, and the availability of pre-trial removal, clearly contemplates removal for denials other than those arising in the courts.

of protest in the endeavor to obtain equality of treatment is irremediable.[41]

In Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965), a statute was attacked as void on its face and also under 42 U.S.C. § 1983 as it was being applied to discourage constitutionally protected activities. Answering the contention that the state court should first pass on these claims, the Court emphasized:

"But the allegations in this complaint depict a situation in which defense of the State's criminal prosecution will not assure adequate vindication of constitutional rights. They suggest that a substantial loss or impairment of freedoms of expression will occur if appellants must await the state court's disposition an ultimate review in this Court of any adverse determination. These allegations, if true, clearly show irreparable injury.

"A criminal prosecution under a statute regulating expression usually involves imponderables and contingencies that themselves may inhibit the full exercise of First Amendment freedoms. See, e. g., Smith v. People of State of California, 361 U.S. 147 [80 S.Ct. 215, 4 L.Ed.2d 205] [1959]. When the statutes also have an overbroad sweep, as is here alleged, the hazard of loss or substantial impairment of those precious rights may be critical. For in such cases, the statutes lend themselves too readily to denial of those rights. The assumption that defense of a criminal prosecution will generally assure ample vindication of constitutional rights is unfounded in such cases. See Baggett v. Bullitt, supra, 377 U.S. [360], at 379 [84 S.Ct. 1316, 12 L.Ed.2d 377]." Id. 380 U.S. at 485–486, 85 S.Ct. at 1120–1121.

Moreover, *Dombrowski* sanctioned an injunction, the effect of which was to terminate all prosecutions in the state court—there could be none in the federal court—while here removal would merely substitute a federal forum for the trial of the criminal prosecutions.[42]

Prior to *Dombrowski* the use of federal injunctions to stay state court proceedings was severely inhibited by the abstention doctrine.[43] The parallel is obvious between that doctrine and the *Rives-Powers* insistence that federal constitutional rights be first litigated in state courts. Both restrictions rest on the assumption that federal constitutional rights will be vindicated by the states, or if not, then the Supreme Court will be in a position eventually to give full effect to those rights. In carving out an exception to the strict application of the absention doctrine, *Dombrowski* recognizes

---

41. "This harassment is endemic to the popular, localized, politics-dominated state criminal administration. It is worked, for the most part, not by final judgment of conviction but by mesne process. It can be stopped only by a federal anticipatory jurisdiction as broad as the evil itself." Amsterdam, 909–10.

42. We are advertent to the affirmance by the Supreme Court of Wells v. Hand, 238 F.Supp. 779 (M.D.Ga.1965), *sub nom.* Wells v. Reynolds, 382 U.S. 39, 86 S.Ct. 160, 15 L.Ed.2d 32, (Oct. 18, 1965), where an injunction against a state prosecution was denied; but that case is different from *Dombrowski*, and from the instant case, which seeks only removal. In *Wells* the court found after plenary hearing that there was no denial of the plaintiffs' civil rights, or any scheme to arrest for the purpose of depriving them or others of any constitutional rights, or any misuse of the criminal process, or any reason to believe that they could not receive a fair trial in the state court. To the contrary, the petition in this case, as we show, alleges all of these grounds for removal.

43. See, *e. g.*, Harrison v. NAACP, 360 U.S. 167, 79 S.Ct. 1025, 3 L.Ed.2d 1152 (1957); Railroad Comm. of Texas v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941); cases cited in Wright, Federal Courts, 170 n. 6 (1963). See generally 1 Barron & Holtzoff, Federal Practice & Procedure (Wright ed.) § 64. *But cf.* McNeese v. Board of Education, 373 U.S. 668, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963).

a set of circumstances in which the assumption underlying both abstention and *Rives-Powers* is without validity, as where "[t]he chilling effect upon the exercise of First Amendment rights may derive from the fact of the prosecution, unaffected by the prospects of its success or failure." 380 U.S. at 487, 85 S.Ct. at 1121. Cf. United States v. Woods, 295 F.2d 772, 781 n. 9 (5th Cir. 1961). Equally without validity is the underlying assumption in the present removal cases, for " '[t]he threat of sanctions may deter [the effective enforcement of rights] almost as potently as the actual application of sanctions. \* \* \*' NAACP v. Button, 371 U.S. 415, 433 [83 S.Ct. 328, 9 L.Ed.2d 405]." Quoted at 380 U.S. 479, 486, 85 S.Ct. 1116, 1121.[44]

It was upon this principle that our court in Jordan v. Hutcheson, 323 F.2d 597 (4th Cir. 1963), authorized an injunction against a Virginia legislative committee which allegedly used its powers to deny Negro attorneys their constitutional rights.

In none of the lower court cases cited by the majority in support of its restrictive reading of section 1443(1) was removal sought in order to avoid the destruction of constitutional rights resulting from the actual arrests, threatened arrests, and pending prosecutions. See, e. g., Steele v. Superior Court of California, 164 F.2d 781 (9th Cir. 1948) (complaint that alleged illegally-seized evidence would be introduced against petitioner at his trial); Hull v. Jackson County Circuit Court, 138 F.2d 820 (6th Cir. 1943) (petitioner's claim that removal automatically ousted state court of jurisdiction rejected under pre-1948 provisions). And People of State of New York v. Galamison, 342 F.2d 255, 271 (2d Cir. 1965) (dictum), while noting the restrictive *Rives-Powers* interpretations of section 1443(1), acknowledged the congressional expectation that those interpretations would be re-examined by the courts.

The majority notes the Fifth Circuit's recognition of the efficacy of section 1443 (1) in civil rights cases, but attempts to distinguish only Rachel v. State of Georgia, supra, and Cox v. State of Louisiana, 348 F.2d 750 (5th Cir. 1965). *Rachel* is distinguished on the ground that it involved sit-ins—conduct which the Supreme Court had declared protected under the Civil Rights Act of 1964; *Cox* on the ground that the defendant was being prosecuted for conduct which the Supreme Court had already declared to be no proper basis for prosecution. Notably, however, the majority does not undertake to distinguish Peacock v. City of Greenwood, 347 F.2d 679 (5th Cir. 1965), which on its facts precisely parallels the present case. There the Fifth Circuit applied section 1443(1) despite the fact that the conduct was alleged to be protected only under the Equal Protection Clause, not by any specific statute or Supreme Court decision. In so doing, that circuit, speaking through Judge Griffin Bell, who had also sat in *Rachel*, reaffirmed the broad interpretation of section 1443(1) and rejected the narrow construction applied by the majority here.

## V. "VERTICAL UNENFORCE-ABILITY"

Under section 1443(1) the denial of, or inability to enforce protected rights must appear in advance of the trial, but our colleagues would require these petitioners to show that they would labor under a similar inability in the state appellate courts.[45] True, the present section 1443 (1) refers to unenforceability in "the courts of the state," but it is clear from the history of the statute that the 1866 Congress did not mean to require a showing of "inability to enforce" in all the

---

44. Judicial eradication of this common underlying assumption is even more significant in light of the close relation between the original injunction provisions, Act of 1871, and the original removal provisions. See note 17, *supra*, and accompanying text.

45. Insofar as removal is authorized solely by the *denial* of rights before trial, the question of vertical enforceability is clearly mooted; once a right has been denied, the statute contemplates removal independent of what may occur in the courtroom.

courts of the state. The original provision, section 3 of the 1866 Act, allowed removal to persons "who are denied or cannot enforce in the courts or judicial tribunals of the State *or locality where they may be* any of the rights secured to them by the first section of this act." (Emphasis added.) If the 1875 statute retained this language and eliminated post-judgment removal intentionally it must have envisioned other causes for removal than facially unconstitutional state statutes.

We think the majority's construction ignores the whole thrust of the legislation, which was to protect the freedman from the denial of his rights by the use of state power—whether statutory or administrative. The language of the 1866 Act permitted removal "at the time of entering his appearance in such court * * * *or* * * * after final judgment," and in the debates preceding passage of the 1866 Act, the concern of Congress was directed not so much to state statutes unconstitutional on their face, as to the denial of equal protection of the law within local communities.[46] Moreover, since removal under section 1443(1) is predicated on a showing of discriminatory *application* of facially constitutional statutes,[47] the delay incident to appeals through the state appellate process would effectively destroy the original purpose of the statute. It has been well said, "litigation is not a meaningful avenue to the enjoyment of federal rights,"[48] and common observation confirms the difficulties inherent in the effort to correct through the state appellate process abuses occurring at the trial level.[49]

Perhaps the most effective answer to the majority's requirement of a showing of "vertical" unfairness lies in the practicalities of framing a record. Assuming the disposition of state appellate courts to enforce federal constitutional rights in civil rights cases, still the determination of the facts on which cases will ultimately turn is within the ambit of the trial court. Abuses occurring at that level are largely uncorrectible on appeal. Evidence may be excluded as irrelevant; cross-examination may be cut off; and witnesses may be intimidated in a coercive atmosphere. In such circumstances direct review of the state trial courts is no guarantee that constitutional rights will be effectively protected.[50] This very case provides an extreme example: the presiding judge who refused to entertain federal constitutional questions would hardly facilitate the preparation of a suitable record for the review of federal claims (see Part I).

## VI. NATURE OF THE REMOVAL HEARING

It is suggested by the majority that the hearing on removability would be equivalent to a hearing on the merits, and that this is not the sort of inquiry which should be indulged as an incident of removal, since the cause for the removal must appear in advance of the trial. The short answer is that since Congress has authorized removal on a pre-trial showing of a denial of, or inability to enforce,

---

**46.** In the principal speech urging passage of the 1866 Act over President Andrew Johnson's veto, Senator Trumbull pointed out that "in some *communities* in the South a custom prevails by which different punishment is inflicted upon the blacks from that meted out to whites for the same offense." Cong.Globe, 39th Cong. 1st Sess. 1758 (April 4, 1866). (Emphasis added.) Recent history indicates that 100 years have not entirely eliminated these local customs.

**47.** See Peacock v. City of Greenwood, *supra*, and our discussion of the 1964 Congress' view of the proper interpretation of § 1443(1), *infra*, Part VII.

**48.** Lusky, "Racial Discrimination and The Federal Law: A Problem in Nullification," 63 Colum.L.Rev. 1163, 1182 (1963).

**49.** For a striking portrayal see Amsterdam at 796–99.

**50.** In the analogous area of federal habeas corpus, the Supreme Court has emphasized the importance of the record formulation in litigation over constitutional claims. See Fay v. Noia, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963); Townsend v. Sain, 372 U.S. 293, 312, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963).

equal civil rights, under color of state law, it is immaterial that such inquiry may involve some of the same questions that will arise in the trial of the merits. Inescapably the District Court must consider the entire atmosphere and consequences of the arrests and pending prosecutions.

Moreover, a determination that these cases are properly subject to removal does not absolve any defendant who has violated the law. The District Court must still consider each case on its merits to determine whether the individual conduct of any of the demonstrators exceeded proper bounds. The preliminary decision on removability merely determines the forum of the trial. This is precisely the congressional design—to afford a fair trial in the federal courts if it is shown that the defendants have been denied their equal civil rights by the actions of state officials under color of local laws, or that these rights cannot be enforced in the state courts. These petitions show on their face that both conditions are satisfied.

### VII. THE NATIONAL CONCERN TODAY

Completely ignored in the majority opinion are the broader considerations unfolded by recent events and expounded in the latest decisions of the Supreme Court. In the full century since the Civil War, Congress has enacted ten civil rights statutes, three of them within the past ten years.[51] The national purpose, as declared by Congress and the Court, has been made manifest. It is to make freedom a reality for the Negro, to secure him against the destruction of his most precious constitutional rights, and generally to permit him to enjoy the guarantees of citizenship equally with members of the white race. Nothing compels the continuance of a narrow legalistic interpretation of the removal provision, a statute which forms an indispensable link in the congressional plan to effectuate equal rights. It is stultifying to the recently

enacted section 901, permitting appellate review of remand orders, to persist in the devitalizing constriction of section 1443. Legislating a right of appeal would be of little worth if Congress did not mean to give section 1443 new force.

The authors of section 901 of the 1964 Civil Rights Act disavowed styptic interpretations of section 1443(1). Senator Humphrey, the floor manager of the Civil Rights bill, noted the apparent limitations imposed by the *Rives-Powers* doctrine, and added the significant comment that

> "*the real problem* at present is not a statute which is on its face unconstitutional; it *is the unconstitutional application of a statute.* When a state statute has been unconstitutionally applied, most Federal District Judges presently believe themselves bound by these old decisions * * *. *Enactment of [section 901] will give the appellate courts an opportunity to re-examine the question.*" 110 Cong.Rec. 6551 (1964). (Emphasis added.)

The point was put even more strongly by Senator Dodd, who had primary responsibility in the Senate for the enactment of section 901, see id. at 6953. In his words,

> "An examination of the legislative history of the act of 1866 * * * and of the apparent Congressional purpose clearly suggests that these old interpretations are erroneous. * * *
>
> "Accordingly the removal statute, intended by Congress to be * * * one of the great bulwarks of equality, is of little or no value today." Id. at 6955.

It was precisely for the purpose of correcting the unwarranted interpretation of section 1443 that section 901 was enacted, since under its provisions, again in Senator Dodd's words, "the appellate courts will be able to consider what the removal statute means and what Congress

---

51. See Civil Rights Acts of 1964, Pub.L. 88–352, 78 Stat. 241; 1960, Pub.L. 86– 449, 74 Stat. 90; 1957, Pub.L. 85–315, 71 Stat. 637.

intended when it enacted the statute." Ibid. He observed:

"In particular, I think cases to be tried in state courts in communities where there is a pervasive hostility to civil rights, and *cases involving efforts to use the court process as a means of intimidation,* ought to be removable under this section [1443]." Ibid. (Emphasis added).

This is precisely the distinguishing feature stressed by the Fifth Circuit in *Peacock*.[52]

Thus, it is plain that in enacting section 901, it was the congressional purpose that the *Rives-Powers* interpretation, if not explicitly rejected by the appellate courts, should nevertheless not stand in the way of removal in cases like those now before us—where the claim is that state criminal prosecutions have been brought to intimidate petitioners, and community hostility to the assertion of equal rights makes a fair trial in the local courts unlikely. The legislative history plainly calls on the federal courts to extend removal to minority groups who can show that local prejudice, expressed through the unconstitutional *application* of state laws, affects their rights.[53] The unwitting effect of the majority's clinging to the gloss placed by *Rives-Powers* upon paragraph 1 is to put our circuit in the cynical position of saying to the petitioners: "Remand orders may now be reviewed on appeal, but this will do you no good, for we will adhere to a paralyzing construction of section 1443." We do not think the Supreme Court today would acquiesce in such a reading.[54]

---

52. In the House a similar view was expressed by Representative Kastenmeir, manager of section 901. He stated that one of the prime purposes of the section was "that the Court[s] of appeals be authorized to reinterpret these [removal] laws." 110 Cong.Rec. 2770 (1964). He anticipated that

"under reinterpretation of section 1443 cases involving State criminal prosecution brought to intimidate the petitioner, [and] cases involving such community hostility that a fair trial in the State or local courts is unlikely or impossible * * * might now well be construed to be within the scope of said section. If so, once again we will breathe life into the Civil Rights Act of 1866 and give meaning to the purpose intended." *Ibid.*

For further discussion, see Amsterdam at 859.

53. See Note, 43 N.C.L.Rev. 628, 635 (1965).

54. Because we conclude that removal of these cases is authorized under section 1443(1), we need not now consider whether paragraph (2) of the section, which authorizes removal of state prosecutions for acts done under "color of authority of laws providing for equal civil rights," applies to private persons.

The Fifth Circuit in *Peacock* states in dictum that paragraph (2) does not apply to private persons, and the rationale of the majority opinion in People of State of New York v. Galamison, 342 F.2d 255 (2d Cir. 1965), leads to the same result. See also City of Chester v. Anderson, 347 F.2d 823 (3d Cir. 1965) (per curiam opinion, with Judge Biggs dissenting). On the other hand, Judge Marshall's dissent in *Galamison* argues cogently that, when applied to particular situations, paragraph (2) allows removal of prosecutions against private individuals; and Professor Amsterdam, after meticulous analysis of the legislative history of the statute, agrees with Judge Marshall. See Amsterdam, at 874–78.