**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

No. 20-1940

PETER VLAMING,

Plaintiff – Appellee,

v.

WEST POINT SCHOOL BOARD; LAURA ABEL, in her official capacity as Division Superintendent; JONATHAN HOCHMAN, in his official capacity as Principal of West Point High School; SUZANNE AUNSPACH, or her Successor in Office, in her official capacity as Assistant Principal of West Point High School,

Defendants – Appellants,

and

JOHN DOE,

Amicus Supporting Appellants.

Appeal from the United States District Court for the Eastern District of Virginia, at Richmond. John A. Gibney, Jr., District Judge. (3:19-cv-00773-JAG)

Argued: May 7, 2021                                   Decided: August 20, 2021

Before FLOYD, RICHARDSON, and QUATTLEBAUM, Circuit Judges.

Affirmed by published opinion. Judge Quattlebaum wrote the opinion, in which Judge Richardson joined and Judge Floyd concurred in the judgment. Judge Floyd wrote a separate concurring opinion.

**ARGUED:** Edward Henderson Williams, II, WILMERHALE LLP, Washington, D.C., for Appellants. Tyson C. Langhofer, ALLIANCE DEFENDING FREEDOM, Ashburn, Virginia, for Appellee. **ON BRIEF:** Stacy Haney, HANEY PHINYOWATTANACHIP, Richmond, Virginia; Paul R.Q. Wolfson, Bruce M. Berman, Tania Faransso, Washington, D.C., Alan E. Schoenfeld, WILMERHALE LLP, New York, New York, for Appellants. J. Caleb Dalton, Washington, D.C., Ryan Bangert, Scottsdale, Arizona, David A. Cortman, ALLIANCE DEFENDING FREEDOM, Lawrenceville, Georgia; Shawn A. Voyles, MCKENRY DANCIGERS DAWSON, P.C., Virginia Beach, Virginia, for Appellee. Luke Platzer, Washington, D.C., Cayman Mitchelle, New York, New York, Kristen Green, JENNER & BLOCK LLP, Los Angeles, California; Asaf Orr, Shannon Minter, NATIONAL CENTER FOR LESBIAN RIGHTS, San Francisco, California, for Amicus Curiae.

QUATTLEBAUM, Circuit Judge:

This appeal provides us the rare opportunity to review a remand order. A local school board fired a teacher for refusing to comply with its policies prohibiting discrimination and harassment. The teacher brought state causes of action in state court to challenge his termination. The school board removed the case to federal court, arguing the court had jurisdiction pursuant to the federal question removal statute, 28 U.S.C. § 1441(c), and the civil rights removal statute, 28 U.S.C. § 1443(2), because the claims turned on the school board's enforcement of Title IX, 20 U.S.C. § 1681. Unconvinced, the district court remanded the case. Because neither statute provides a basis for removal here, we affirm.

I.

A.

John Doe was a student at West Point High School, a public school in Virginia. At the start of the school year, Doe and his parent met with the school's assistant principal, Suzanne Aunspach, to explain that he had recently undergone a gender transition and had adopted a preferred name consistent with that transition. They requested that school staff use male pronouns and refer to Doe by his new name.

Peter Vlaming was Doe's French teacher. He had taught Doe for two years before Doe underwent his transition. Shortly after their meeting with Aunspach, Doe, his parents and the school guidance counselor met with Vlaming to discuss Doe's new name and preferred pronouns. After the meeting, Aunspach told Vlaming he was expected to use Doe's preferred name and male pronouns.

3

Over the next two months, Vlaming referred to Doe by his new name, but he avoided the use of pronouns altogether when speaking to Doe directly and on at least one occasion referred to him using female pronouns in Doe's absence. Doe and his parents expressed frustration with Vlaming over this practice. Aunspach met with Vlaming again to reiterate Doe's preferences. She told Vlaming that his refusal to use male pronouns potentially violated both Title IX, which prohibits schools receiving federal funds from discriminating on the basis of sex, and the West Point School Board's policies. She provided Vlaming with written guidance regarding transgender students' rights. Vlaming told her that using male pronouns to refer to someone who was born a female violated his religious beliefs because it was untruthful. Aunspach reiterated that Vlaming should use male pronouns to refer to Doe and that failure to do so could result in his termination.

Shortly thereafter, the principal, Jonathan Hochman, met with Vlaming. He directed Vlaming to use male pronouns to refer to the student. The next day, Hochman warned Vlaming that a refusal to comply with the School Board's policies would result in a letter of formal reprimand. That same day, Vlaming, apparently accidentally, used a female pronoun to refer to Doe during a classroom activity. Afterwards, Vlaming reported the incident to Principal Hochman. Doe subsequently withdrew from Vlaming's class, citing this incident and others. On Hochman's recommendation, the superintendent placed Vlaming on administrative leave pending an investigation.

During this leave, Principal Hochman gave Vlaming a final warning, which explained that his refusal to use Doe's preferred pronouns violated two school board

policies that prohibited discrimination and harassment based on gender identity.[1] The superintendent also ordered Vlaming to refer to Doe using only male pronouns and warned him that if he treated Doe differently than other male students, he would be terminated.

Vlaming refused to comply with these directives. The superintendent therefore recommended his dismissal to the School Board. After a hearing, the Board dismissed Vlaming. In a letter explaining its rationale, the Board stated that Vlaming had failed to comply with his superiors' directives and had violated the Board's policies prohibiting discrimination and harassment because his actions singled out Doe in a way that was noticed by Doe and his peers.

## B.

Vlaming sued the School Board, and several school officials in their official capacity (collectively the "Board"), alleging that their decision to terminate his

---

[1] The nondiscrimination policy states:
> The West Point School Board is committed to nondiscrimination with regard to race, color, religion, national origin, ancestry, political affiliation, sex, sexual orientation, gender, gender identity, age, marital status, genetic information or disability as defined by law. This commitment will prevail in all division policies and practices concerning staff, students, educational programs and services, and with individuals/entities whom the Board does business.

J.A. 85.

The nonharassment policy states:
> It is a violation of this policy for any student or school personnel to harass a student or school personnel based on . . . sex, sexual orientation, gender, gender identity . . . as defined by law, or based on a belief that such characteristic exists at school or any school sponsored activity.

J.A. 87.

employment violated state statutory and constitutional protections. Specifically, he claimed the Board's termination after his refusal to use Doe's preferred pronouns violated his due process, free speech and free exercise rights under the Virginia Constitution and Virginia statutory free exercise protections. He also claimed that the Board violated Virginia's Dillon Rule[2] by adopting nondiscrimination policies more stringent than the laws of Virginia.[3] He also brought a breach of contract claim.

The Board removed the case to federal court, but Vlaming moved to remand. In response, the Board argued the district court had removal jurisdiction under both 28 U.S.C. §§ 1441(c) and 1443(2). They argued the district court had federal question jurisdiction, allowing for removal under § 1441(c), because Vlaming's claims necessarily raise a disputed and substantial federal question—whether Title IX prohibits discrimination on the basis of gender identity. In addition, they argued, because Virginia interprets its due process, free speech and free exercise provisions as co-extensive with its federal counterparts, those claims also raised substantial federal questions. As to the civil rights

---

[2] The Dillon Rule provides that local governments "have only those powers that are expressly granted, those necessarily or fairly implied from expressly granted powers, and those that are essential and indispensable." *Bd. of Zoning Appeals v. Bd. of Supervisors*, 666 S.E.2d 315, 317 (Va. 2008).

[3] Specifically, Vlaming argued the Board's nondiscrimination policy violated Virginia Code § 15.2-965 (2019), which at the time provided that "[a]ny locality may enact an ordinance, not inconsistent with nor more stringent than any applicable state law, prohibiting discrimination in . . . education on the basis of race, color, religion, sex, pregnancy, childbirth or related medical conditions, national origin, age, marital status, or disability." That provision has since been amended to include gender identity among the list of characteristics protected from discrimination from which localities may pass ordinances. *See* 2020 Va. Laws 1140 (S.B. 868).

removal statute, the defendants argued that because Title IX was a "law providing for equal rights," §1443(2) authorized removal. 28 U.S.C. § 1443(2).

The district court granted Vlaming's motion. As to federal question jurisdiction, the district court reasoned that Vlaming's Dillon Rule claim dealt with the scope of state law, not Title IX. And to the extent Title IX was relevant to the breach of contract claim, it was a defense, not a necessary element of the claim. In addition, Vlaming's state constitutional claims did not provide federal question jurisdiction either, even though those constitutional provisions are coextensive with their federal counterparts. The district court reasoned that although the state court had the ability to use federal law to resolve the state constitutional claim, it did not have to, and it declined to "speculate that a state court will rely on federal law to resolve this lawsuit." J.A. 112.

As to the civil rights removal statute, the district court concluded that § 1443(2) did not apply to Title IX. It pointed to the Supreme Court's limitation of § 1443(1) to laws addressing racial equality in *Georgia v. Rachel*, 384 U.S. 780, 792 (1966), and after noting that the Fourth Circuit has yet to decide whether the reasoning of that case applies to § 1443(2), it pointed to an older Fourth Circuit case and recent district court opinions to conclude that the same limitation applies to § 1443(2). Consequently, the district court remanded the case to state court.

The Board timely appealed pursuant to 28 U.S.C. § 1447(d), which allows appellate review for "an order remanding a case to the State court from which it was removed pursuant to section 1442 or 1443 . . . ."

## II.

We review issues of subject matter jurisdiction, including removal, de novo. *Common Cause v. Lewis*, 956 F.3d 246, 252 (4th Cir. 2020). Ordinarily, however, a remand order is not reviewable. *See* 28 U.S.C. § 1447(d). But when a defendant removes a case to federal court pursuant to the civil rights removal statute, "§ 1447(d) permits appellate review of the district court's remand order—without any further qualification." *BP P.L.C. v. Mayor & City Council of Baltimore*, 141 S.Ct. 1532, 1538 (2021). Therefore, we have jurisdiction to review the entire remand order and can consider all of the Board's arguments supporting jurisdiction that were addressed in that order. *Id.*

## III.

We begin with asking whether federal question jurisdiction provides a basis for removal under § 1441(c) before analyzing the civil rights removal statute, § 1443(2).

### A.

Federal courts have jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. Most cases that obtain federal jurisdiction under this statute do so when federal law creates the cause of action. In a "slim category" of cases, *Gunn v. Minton*, 568 U.S. 251, 258 (2013), however, federal courts have jurisdiction over state law causes of action when "the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law." *Franchise Tax Bd. v. Constr. Laborers Vacation Tr.*, 463 U.S. 1, 28 (1983). The Board argues this is one of those cases. We disagree.

The "mere presence of a federal issue in a state cause of action" is not, by itself, enough to confer federal question jurisdiction. *Merrell Dow Pharm., Inc. v. Thompson*, 478 U.S. 804, 813 (1986). Instead, a federal issue in a state law claim must be "(1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn*, 568 U.S. at 258. That first requirement is the most relevant to our analysis. To necessarily raise a federal issue, a state law claim must hinge on the determination of a federal issue. The federal issue must be "essential to resolving a state-law claim, meaning that '*every* legal theory supporting the claim requires the resolution of a federal issue.'" *Burrell v. Bayer Corp.*, 918 F.3d 372, 383 (4th Cir. 2019) (quoting *Dixon v. Coburg Dairy, Inc.*, 369 F.3d 811, 816 (4th Cir. 2004)). If, on the other hand, the plaintiff "can establish all the necessary elements entirely independently of federal law," a federal issue is not necessarily raised. *Id.* at 382.

Vlaming does not assert any federal causes of action. He brought nine claims—three based on the Virginia Constitution's free speech protections, two based on free exercise protections in the Virginia Constitution and state law, one based on the due process requirements in the Virginia Constitution, one based on a Virginia Constitution non-discrimination provision, one that alleges violation of Virginia's Dillon Rule and Code § 15.2-965, and one breach of contract claim. None of those claims contain any federal cause of action, removing this case from prototypical § 1331 jurisdiction.

Nor does this case fall into the "narrow class of state-law actions" that necessarily raise substantial federal questions. The Board argues that Vlaming's statutory and breach of contract claims turn on whether Title IX prohibits discrimination based on gender

9

identity. But Vlaming can establish all of his state law claims without resolving any federal questions; it is the defense that may hinge on the Title IX issue. "A federal question is 'necessarily raised' for purposes of § 1331 only if it is a 'necessary element of one of the well-pleaded state claims.'" *Burrell*, 918 F.3d at 381 (quoting *Franchise Tax Bd.*, 463 U.S. at 13). While the Board may invoke Title IX as a defense to some of Vlaming's claims, that alone cannot establish jurisdiction. *Id.* ("It is *not* enough that federal law becomes relevant by virtue of a 'defense . . . anticipated in the plaintiff's complaint.'" (quoting *Franchise Tax Bd.*, 463 U.S. at 14)). We consider each of Vlaming's claims in turn.

The Dillon Rule claim does not necessarily raise a federal question. The Dillon Rule provides that local governments "have only those powers that are expressly granted, those necessarily or fairly implied from expressly granted powers, and those that are essential and indispensable." *Bd. of Zoning Appeals v. Bd. of Supervisors*, 666 S.E.2d 315, 317 (Va. 2008). Vlaming alleges that the Board violated this rule as applied to Va. Code § 15.2-965 (2019), which provided that "[a]ny locality may enact an ordinance, not inconsistent with nor more stringent than any applicable state law, prohibiting discrimination in . . . education on the basis of race, color, religion, sex, pregnancy, childbirth or related medical conditions, national origin, age, marital status, or disability." Vlaming argues that because Va. Code § 15.2-965 did not specify gender identity as a protected class, the Board acted beyond its authority to include gender identity as a protected characteristic in its nondiscrimination policy. Regardless of the Board's reasoning or justifications for including this characteristic in its non-discrimination policy, Title IX is irrelevant to the analysis of this claim. The analysis depends on whether the Board exceeded its authority

under state law. *See* Va. Code § 15.2-965 (asking whether the ordinance is more stringent than "applicable *state* law" (emphasis added)). While Title IX could potentially be used as a defense if Vlaming were to succeed on this claim, resolution of the Title IX question is not "a necessary element" of the claim, and, therefore, no federal question is "necessarily raised." *Burrell*, 918 F.3d at 381 (internal citation and quotation marks omitted).

Similarly, Vlaming's breach of contract claim does not necessarily raise a federal question. "The elements of a breach of contract action are (1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation." *Filak v. George*, 594 S.E.2d 610, 614 (Va. 2004). The Board argues that Title IX compels them to fire Vlaming because he was discriminating against Doe based on sex. But, once again, that is a defense to the breach of contract, not a necessary element of the claim. Therefore, federal question jurisdiction cannot be established on this basis. *Burrell*, 918 F.3d at 381.

Finally, Vlaming's state constitutional claims do not necessarily raise a federal question either. The Board argues they do because Virginia's free speech and due process clauses are coextensive with their analogous federal constitutional provisions. *See Shivaee v. Commonwealth*, 613 S.E.2d 570, 574 (Va. 2005); *Elliott v. Commonwealth*, 593 S.E.2d 263, 269 (Va. 2004). Thus, they point out, courts generally apply the same analysis to both federal and Virginia constitutional claims even though they arise under different sources of law. *See Elliott*, 593 S.E.2d at 269. While the Board is correct in those positions, they are insufficient to confer federal question jurisdiction. Although Virginia courts may rely

11

on federal law to decide a state constitutional question, there is no requirement that they must. Nothing prevents Vlaming from prevailing on his state constitutional claims on exclusively state grounds. We cannot speculate how the state court may resolve the state constitutional claim. As the state is not required to rely on federal law, no federal question is necessarily raised. *See Rossello-Gonzalez v. Calderon-Serra*, 398 F.3d 1, 13 (1st Cir. 2004).

Undeterred, the Board offers a twist to its argument for jurisdiction based on Vlaming's Virginia constitutional claims. It argues the interpretation of the federal constitution compels, rather than merely guides, the interpretation of the Virginia constitutional provisions. In support of this argument, the Board points to the United States Supreme Court's appellate jurisdiction under 28 U.S.C. § 1257, which extends to state court cases "where the validity of a treaty or statute of the United States is drawn in question or where the validity of a statute of any State is drawn in question on the ground of its being repugnant to the Constitution, treaties, or laws of the United States . . . ." The Supreme Court has interpreted that statute to confer jurisdiction over state supreme court decisions that "apply the same analysis" in considering analogous state and federal constitutional claims. *Fitzgerald v. Racing Ass'n of Central Iowa*, 539 U.S. 103, 106 (2003). In other words, even if a decision rests nominally on a state constitutional provision, it necessarily presents a federal question sufficient to support Supreme Court review when the interpretation of federal law compels the result. The Board argues when a state court interprets state and federal constitutional protections identically—like Virginia

does here—a decision nominally on a state constitutional provision necessarily rests on federal grounds.

As the district court explained, however, that is a retrospective analysis, because when the Supreme Court is deciding whether to take a case under § 1257, it already knows whether the state has used the federal constitution in its analysis. Here, we must deal with a prospective analysis, and there is no reason that the state court could not decide this case on purely state law grounds and even deviate from the federal constitution if it wished.

Vlaming, as master of his complaint, elected not to bring any federal constitutional claims. This is unlike all the cases the Board cites to support removal, where the plaintiffs brought both state and federal constitutional claims. Considering those important differences, those cases do not seem instructive, nor does § 1257.

For those reasons, none of Vlaming's state law claims necessarily raise a federal issue. Therefore, federal question jurisdiction is lacking, and § 1441(c) does not provide a basis for removal.

B.

We now turn to 28 U.S.C. § 1443, the civil rights removal statute. Section 1443(2) provides for removal of a civil action or criminal prosecution commenced in state court "[f]or any act under color of authority derived from any law providing for equal rights, or for refusing to do any act on the ground that it would be inconsistent with such law." The Board argues that either operative phrase provides them with the ability to remove—they either fired Vlaming in order to comply with Title IX, or they refused to permit Vlaming to discriminate, or to grant him an exception to their policies because of his religious

13

beliefs, on the grounds that doing so would be inconsistent with Title IX. Precedent, however, precludes Title IX from being the type of "law providing for equal rights" referenced in § 1443(2).

The Supreme Court has limited the meaning of a "law providing for equal rights" in § 1443 to only those concerning racial equality. In *Georgia v. Rachel*, 384 U.S. 780, 792 (1966), the Court addressed whether the defendants could remove their criminal prosecutions to federal court under § 1443(1) by invoking the First Amendment and the Due Process Clause of the Fourteenth Amendment. In answering no, the Court recounted the history of the statute and the context in which it was passed. While noting that "Congress' choice of the open-ended phrase 'any law providing for . . . equal civil rights'" clearly indicated an intent to include cases involving rights under "both existing and future statutes that provided for equal civil rights," *Rachel*, 384 U.S. at 789, the Court explained that the phrase "must be construed to mean any law providing for specific civil rights stated in terms of racial equality." *Id.* at 792. The Court reached that conclusion "[o]n the basis of the historical material" available to it. *Id.* Because the First Amendment and the Due Process Clause were "phrased in terms of general application available to all persons or citizens, rather than in the specific language of racial equality that § 1443 demands," removal was not proper based on that statute. *Id.*

The Board contends that *Rachel* does not control here because its holding only addressed whether broad constitutional provisions, like the First Amendment and Due Process Clause, were included in the removal statute. It argues that *Rachel* did not address whether laws providing for sex equality were laws "providing for . . . equal civil rights" in

14

§ 1443(1). To read *Rachel*'s holding so narrowly, we would have to ignore the Supreme Court's reasoning and repeated explicit mention of racial equality as the sole subject of that statutory phrase. The Supreme Court's reference to racial equality as the limits of that phrase was not in passing. It was the centerpiece of its reasoning. The Court traced the phrase back to its legislative origins in the Revised Statutes of 1874, when the removal provision was separated from the substantive provisions of the Civil Rights Act of 1866. *Rachel*, 384 U.S. at 789. The Court reasoned that "[i]n spite of the potential breadth of the phrase . . . it seems clear that . . . Congress intended in that phrase only to include laws comparable in nature to the Civil Rights Act of 1866." *Id.* at 789–90. "The legislative history of the 1866 Act clearly indicates that Congress intended to protect a limited category of rights, specifically defined in terms of racial equality." *Id.* at 791; *see also id.* (Congress specifically added the phrase "as is enjoyed by white citizens" to the Civil Rights Act of 1866 "to emphasize the racial character of the rights being protected."). Therefore, the Court concluded, "[o]n the basis of the historical material that is available . . . 'any law providing for . . . equal civil rights' must be construed to mean any law providing for specific civil rights stated in terms of racial equality." *Id.* at 792; *see also id.* ("[T]he guarantees of [the First Amendment and Due Process Clause] are phrased in terms of general application available to all persons or citizens, rather than in the specific language

15

of racial equality that § 1443 demands."); *id.* ("[The Civil Rights Act of 1964] is clearly a law conferring a specific right of racial equality . . . .").[4]

Also, even following Title IX's enactment, the Court repeated this understanding of § 1443. *See Johnson v. Mississippi*, 421 U.S. 213, 219 (1975) ("Claims that prosecution and conviction will violate rights . . . under statutes not protecting against racial discrimination[] will not suffice."); *see also Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 622–23 n.41 (1979). We must take the Supreme Court at its word and faithfully apply its precedent—"any law providing for . . . equal civil rights" as referenced in § 1443(1) only includes those addressing racial equality.[5]

We agree with the Board that the plain text of the statute suggests a broader interpretation of "equal civil rights." 28 U.S.C. § 1443(1). The statute does not specify "racial equality;" it includes "any law providing for . . . equal civil rights." *Id.* But it is the Supreme Court's decision, not ours, as to whether the interpretation in *Rachel* is worth revisiting.[6] We are bound to follow it.

---

[4] The Civil Rights Act of 1964 was passed after the Court granted certiorari in *Rachel* but before the case was decided. The Court held that this statute, because of its racial equality protections, but not the First Amendment or Due Process Clause, could serve as a basis of removal for criminal prosecutions of sit-ins. *Id.* at 794.

[5] This is not the first time we have read *Rachel* as limiting § 1443 to laws concerning racial equality. Even in the context of removal premised upon sex discrimination, we have already applied *Rachel* in this manner. *See Wilkins v. Rogers*, 581 F.2d 399, 403 (4th Cir. 1978); *Delavigne v. Delavigne*, 530 F.2d 598, 600–01 (4th Cir. 1976).

[6] Our concurring colleague concludes *Rachel* can be avoided because it was decided before Title IX's enactment. But nothing in Title IX suggests any intent to override Supreme Court precedent concerning removal jurisdiction in § 1443. And as our colleague

16

The Board makes a final attempt to escape *Rachel*'s reach. It argues that *Rachel* interpreted paragraph (1) of § 1443, not paragraph (2), and thus we should interpret the phrase "any law providing for equal rights" in § 1443(2) differently. But there are two problems with this argument. First, the text just does not support a different interpretation. To be sure, there is a small difference between the relevant phrases in paragraphs (1) and (2). Section 1443(1) describes "any law providing for the equal *civil* rights," (emphasis added) whereas § 1443(2) describes "any law providing for equal rights." Even so, to make an interpretive distinction between those phrases would make a mountain out of a molehill.

Second, paragraph (2) of §1443 was derived from the same civil rights statute as paragraph (1), and it was from that civil rights statute that the Supreme Court concluded in *Rachel* that paragraph (1) was limited to racial inequities. The Supreme Court, the same day it decided *Rachel*, explained in its companion case that "[t]he progenitor of § 1443(2) was [Section] 3 of the Civil Rights Act of 1866 . . . ." *City of Greenwood v. Peacock*, 384 U.S. 808, 815 (1966). And we previously reached the same conclusion shortly before *Rachel* was decided. *See Baines v. City of Danville*, 357 F.2d 756, 772 (4th Cir. 1966), *cert. granted*, *judgment aff'd*, 384 U.S. 890 (1966) (per curiam) (explaining that the refusal clause in § 1443(2) "was intended to enable state officers who refused to enforce discriminatory state laws in conflict with Section 1 of the Civil Rights Act of 1866" to remove their prosecutions to federal court). In other words, § 1443(2) directly relates back to the same civil rights statute on which the Court premised its holding in *Rachel*. Because

---

concedes, both "original legislative intent" and *Rachel* clearly limit § 1443 to laws dealing with racial equality.

17

both paragraphs relate back to that same statute, we see no reason the Supreme Court's limitation of paragraph (1) to laws concerning racial equality would not apply to paragraph (2).

To be clear, we do not endorse *Rachel*'s reasoning or conclusion. But we are bound to apply it. Therefore, we are compelled to reach the same conclusion as the district court—§ 1443, including paragraph (2), only pertains to laws dealing with racial equality, which is not the case here.

IV.

Neither § 1441 nor § 1443 provides a basis for removal here. Therefore, the district court's remand order is

*AFFIRMED.*

FLOYD, Circuit Judge, concurring in the judgment:

I agree that the district court correctly remanded this case for lack of jurisdiction under either 28 U.S.C. § 1441(c) or 28 U.S.C. § 1443(2). I write separately solely to address the majority's position that Title IX is not a "law providing for equal rights" within the meaning of § 1443(2).

As the majority describes, sixty years ago in *Georgia v. Rachel*, the Supreme Court limited the phrase "any law providing for . . . equal civil rights" in § 1443(1) to mean "any law providing for specific civil rights stated in terms of racial equality." 384 U.S. 780, 792 (1966). And I agree with the majority that we should interpret the language in § 1443(2) in keeping with that of § 1443(2). Thus, read alone, *Rachel* would be determinative of the instant issue. After all, Title IX is not a law providing for racial equality.

But we must read *Rachel* within its historical context. To do so, we must first understand the Court's logic in *Rachel*. The Court based its holding on the legislative history of § 1443. *See id.* at 786. Section 1443 originated as part of the Civil Rights Act of 1866. *Id.* The original provision in the Civil Rights Act of 1866—the precursor to § 1443—did not contain the phrase "law providing for . . . equal civil rights." *Id.* at 788 (quoting § 1443(1)). Instead, the provision relied on internal cross-reference by allowing removal in cases involving "rights secured . . . by the first section of this act." *Id.* at 788–89 (quoting Civil Rights Act of 1866, ch. 31, § 3, 14 Stat. 27 (current version at § 1443)).

When Congress enacted the Revised Statutes of 1874, however, it carried forward the substantive provisions of the Civil Rights Act of 1866 into various sections. *Id.* at 789. As such, the removal provision could no longer cross-reference to "rights secured . . . by

19

the first section of this act." *Id*. (quoting Civil Rights Act of 1866 § 3). Instead, Congress

added the "open-ended phrase 'any law providing for . . . equal civil rights.'" *Id*. (quoting

Rev. Stat. § 641 (1875)). In choosing this open-ended language, Congress did not "intend[]

to expand the kinds of 'law' to which the removal section referred." *Id.* at 789. Rather,

Congress intended § 1443 to allow removal only in cases involving "existing and future

statutes" that are "comparable in nature to the Civil Rights Act of 1866." *Id.* at 789–90.[1]

At the time that Congress added this language, the *only* statutes that were "comparable in

nature to the Civil Rights Act of 1866" were those statutes stated in terms of racial equality.

Naturally, then, this legislative history indeed establishes that Congress originally intended

§ 1443 to apply only to laws protecting racial equality. *See id.* at 791.

But original legislative intent carries us only so far when we have intervening

legislative authority. Six years after the Supreme Court decided *Rachel*, Congress enacted

Title IX of the Education Amendment of 1972, 20 U.S.C. § 1681(a). Congress patterned

Title IX directly after Title VI of the Civil Rights Act of 1964.[2] *Cannon v. Univ. of Chi.*,

441 U.S. 677, 694–96 (1979); *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 286

---

[1] Our pre-*Rachel* decision in *Baines v. City of Danville*, 357 F.2d 756 (4th Cir.), *aff'd*, 384 U.S. 890 (1966), also emphasized the broad, prospective language of § 1443. We noted that this language recognized "that the laws were not static and that the Congress in the future might enact additional legislation similar to the Civil Rights Acts of 1866 and 1870, with an intention to expand the removal rights." *Id.* at 764.

[2] Courts have concluded that Title VI, of course, serves as a proper basis for removal under § 1443(2). *See, e.g.*, *Bohlander v. Indep. Sch. Dist. No. 1*, 420 F.2d 693, 694 (10th Cir. 1969) (per curiam) (finding removal proper under § 1443(2) in a Title VI case); *Burns v. Bd. of Sch. Comm'rs*, 302 F. Supp. 309, 312 (S.D. Ind. 1969) (same), *aff'd*, 437 F.2d 1143 (7th Cir. 1971) (per curiam); *Linker v. Unified Sch. Dist. No. 259*, 344 F. Supp. 1187, 1195 (D. Kan. 1972) (same).

20

(1998) ("Title VI . . . is parallel to Title IX except that it prohibits race discrimination, not sex discrimination, and applies in all programs receiving federal funds, not only in education programs." (citations omitted)). The Supreme Court has since explained that "[t]he drafters of Title IX explicitly assumed that it would be interpreted and applied as Title VI had been during the preceding eight years." *Cannon*, 441 U.S. at 696. The Court in *Rachel* could not have considered whether Title IX was "a law providing for equal rights" within the meaning of § 1443 because Title IX did not yet exist. Had the Court been faced with that issue, I believe it would have concluded that Title IX is indeed "comparable in nature to the Civil Rights Act of 1866" because Title IX was explicitly based upon Title VI, which is itself comparable in nature to the Civil Rights Act of 1866.

I cannot fault the majority for its strict adherence to precedent. But I write separately because I believe such precedent cannot be strictly applied when viewed in context. Although the legislative history of § 1443 indicates Congress intended for it to apply to laws providing for racial equality, Congress also allowed for the possibility that § 1443 would apply to statutes "comparable" to the Civil Rights Act of 1866. Congress enacted just such a "comparable" statute in Title IX by patterning it directly upon Title IV.[3]

---

[3] We have previously applied *Rachel* to hold that allegations of unconstitutional sexual discrimination are not cognizable under § 1443(1). *See Wilkins v. Rogers*, 581 F.2d 399, 402–03 (4th Cir. 1978) (per curiam) (finding removal was not authorized under § 1443(1) for suit alleging unconstitutional sexual discrimination); *Delavigne v. Delavigne*, 530 F.2d 598, 600–01 (4th Cir. 1976) (same). This comports with *Rachel*'s precise holding that broad constitutional claims cannot support removal under § 1443. *Rachel*, 384 U.S. at 792. Notably, we deal here not with a constitutional claim, but with a statutory Title IX claim.

This conclusion would not change the ultimate disposition of the instant case. The Board fails to meet the other requirements of § 1443(2) regardless. Removal under the statute is proper under either of the two clauses: (1) for claims "[f]or any act under color of authority derived from any law providing for equal rights" or (2) for claims that arise from "refusing to do any act on the ground that it would be inconsistent with such law." § 1443(2). The Board's arguments fail under both clauses.

The first clause of § 1443(2) is available only to federal officers or agents acting under federal officers. The Board argues that in terminating Vlaming for discriminating against Doe, the Board acted under federal officers by complying with Title IX. But the Supreme Court has clarified that "the help or assistance necessary to bring a private person within the scope of the statute does *not* include simply *complying* with the law." *Watson v. Philip Morris Cos.*, 551 U.S. 142, 152 (2007).

Nor does the Board meet the requirements of the second clause of § 1443(2), also known as the refusal clause. The refusal clause allows state officers to remove claims "for refusing to do any act on the ground that it would be inconsistent with [any law providing for equal rights]." § 1443(2); *see also White v. Wellington*, 627 F.2d 582, 585 (2d Cir. 1980) (explaining that the legislative history of § 1443(2) indicates that the phrase "state officers" includes local and municipal officials). This Court has repeatedly emphasized that the refusal clause is available only to state officers who refuse to enforce discriminatory state law. *See Common Cause v. Lewis*, 956 F.3d 246, 254 (4th Cir. 2020) ("[T]he Supreme Court, in reviewing the Refusal clause, explained that it is 'clear that removal . . . is available only to state officers,' with the legislative history indicating that

22

this clause applies to officers 'who shall refuse *to enforce* State laws.'" (quoting *City of Greenwood v. Peacock*, 384 U.S. 808, 824 n.22 (1966))); *Baines*, 357 F.2d at 772 ("The refusal language . . . was intended to enable state officers who refused *to enforce* discriminatory state laws . . . ." (emphasis added)).

The Board claims that in firing Vlaming, it was refusing to enforce the Virginia Religious Freedom Restoration Act (VRFRA), Va. Code Ann. § 57–1, as conflicting with Title IX. The Board explains that if Vlaming's interpretation of VRFRA is correct and the Board violated VRFRA by firing Vlaming, then the Board necessarily refused to enforce VRFRA in favor of upholding Title IX. But this logic does not follow. An act does not constitute a refusal to enforce a state law any time the act merely allegedly violates that state law. Such an assumption would amount to a massive expansion of the refusal clause.

Rather, the legislative history of the refusal clause indicates that it was "intended to enable State officers, who shall refuse to enforce [discriminatory] State laws . . . to remove their cases to the United States courts when prosecuted for refusing to enforce those laws." *Peacock*, 384 U.S. at 824 n.22 (quoting Cong. Globe, 39th Cong., 1st Sess. 1367 (1866)). This denotes some affirmative rejection of state law in favor of federal law. *See, e.g.*, *White*, 627 F.2d at 586–87 ("[T]he 'jurisdictional touchstone' [is] 'a colorable conflict between state and federal law' *leading to* the removing defendant's refusal to follow plaintiff's interpretation of state law because of a good faith belief that to do so would violate federal law." (emphasis added) (quoting *White*, 627 F.2d at 592 (Meskill, J., dissenting))). Here, nowhere does either party indicate that the Board refused to enforce

VRFRA on *any* ground, much less on Title IX grounds.  It is not sufficient that the parties retrospectively allege a conceivable conflict between VRFRA and Title IX.

Accordingly, although I believe that Title IX is properly a "law providing for equal rights" within the meaning of § 1443(2), I agree with the majority's conclusion that the Board has failed to show this case qualifies for removal under § 1443(2).  For these reasons, I respectfully concur in the judgment.